The **ASSINIBOINE & SIOUX TRIBES,** **et al., Plaintiffs,**

v.

The **STATE OF MONTANA, et al., Defendants.**

**No. CV–81–8–GF.**

United States District Court, D. Montana, Great Falls Division.

July 1, 1983.

Reid Peyton Chambers, Lloyd Benton Miller, Sonosky, Chambers, Sachse & Guido, Washington, D.C., Swanberg, Koby, Swanberg & Matteucci, Great Falls, Mont., for plaintiffs.

Mike Greely, Atty. Gen. of Mont., Helena, Mont., Helena S. Maclay, Sp. Asst. Atty. Gen., Missoula, Mont., Sp. Atty. for Dept. of Revenue, Deirdre Boggs, Sp. Asst. Atty. Gen., Missoula, Mont., Sp. Dept. Atty. for Roosevelt County, for defendants.

## MEMORANDUM AND ORDER

HATFIELD, District Judge.

Presently before the court are the parties' cross-motions for full or partial summary judgment. Oral argument was held in this matter on September 7, 1982. Additional exhibits were subsequently filed, as was a set of stipulated facts, on April 7, 1983. Having considered the exhibits and the arguments presented by counsel at oral argument and in extensive memoranda, the court is now prepared to rule.

This action was initially commenced by the Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation (the "Tribes"), on their own behalf and as *parens patriae* on behalf of all Indians residing on that reservation, and Caleb Shields, individually and on behalf of the class of all others similarly situated. The original complaint was filed January 20, 1981. On July 6, 1981, plaintiffs' first amended complaint was filed, adding four additional individual plaintiffs and class representatives, and a further claim for relief. The expressed purpose of this lawsuit is to challenge the validity of certain taxes imposed under the laws of Montana against property owned by the Tribes and individual Indians residing on the Fort Peck Reservation.

The taxes at issue are 1) Montana's new car tax, codified at § 61–3–502 M.C.A. (1979), and 2) Montana's motor vehicle property tax, codified at § 61–3–504 M.C.A. (1979).[1] The plaintiffs contend that both of these taxes have been improperly collected from the Tribes and from all Indians residing on the Fort Peck Reservation, whether enrolled in the Assiniboine and Sioux Tribes or not. Plaintiffs ask this court to declare that the State of Montana cannot collect either of these taxes from the Tribes or *any* Indian residing on the Fort Peck Reservation. Plaintiffs further request that the State be ordered to refund all taxes wrongfully collected, plus interest. The Tribes also seek damages.

On August 26, 1981, this court entered a partial judgment on the pleadings, pursuant to a stipulation of the parties. That stipulation was based upon a type of tax exemption defined by the United States Supreme Court in *McClanahan v. Arizona State Tax Commission,* 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973). The judgment entered in this case declared that the Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation, Montana, and the enrolled members of the Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation, residing on the Fort Peck Indian Reservation, Montana, who purchase new motor vehicles within the exterior boundaries of the Fort Peck Indian Reservation, are as a matter of federal law exempt from payment of Montana's new car sales tax, § 61–3–502 M.C.A. (1979), as a condition to application for registration of new motor vehicles pursuant to § 61–3–303(2)(b) M.C.A. (1979).

Further, on November 16, 1981, partial judgment on the pleadings was entered, again pursuant to a stipulation of the parties, declaring that the Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation, Montana, and the enrolled members of the Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation permanently residing on the Fort Peck Indian Reservation, Montana, are as a matter of federal law exempt from payment of the personal property tax, §§ 61–3–503 and 61–3–504 M.C.A. (1979), on vehicles that they own, as a condition to application for registration or reregistration of motor vehicles pursuant to § 61–3–303(2)(b) M.C.A. (1979). *Washington v. Confederated Tribes of the Colville Indian Reservation,* 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980); *Moe v. Confederated Salish and Kootenai Tribes of the Flathead Reservation,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976).

What remains, therefore, are the following issues: 1) whether Montana may collect these taxes from Indians residing on the Fort Peck Reservation who are not enrolled in the Assiniboine and Sioux Tribes; 2) whether Montana may collect the new car tax from the Tribes or Indians enrolled in the Assiniboine and Sioux Tribes, when the new vehicle is purchased outside the bound-

1. The new car tax is collected when the vehicle owner seeks to license the vehicle for the first time. The Treasurer of the County where the vehicle is licensed computes the tax, which is a percentage of the f.o.b. factory list price. The motor vehicle property tax, which is paid annually when a vehicle is reregistered, was, at the time this action was filed, computed on the basis of the mill levy of the year preceding the current year of application. All vehicles registered on or after January 1, 1982 are subject to a motor vehicle property tax based upon a set fee imposed according to the vehicle's age and weight. The plaintiffs assert that the new system, as applied to them, is just as objectionable and improper as the old system.

aries of the Fort Peck Reservation; and 3) whether this court has jurisdiction over the claims of the individual plaintiffs. Summary judgment is sought as to each of these issues.

NEW CAR TAX

Montana's new car tax was collected from all purchasers of new vehicles who sought to license those vehicles since the tax's inception in 1965 up until approximately December 26, 1980. Since December 26, 1980, the Tribes, and enrolled members of the Tribes residing on the Fort Peck Reservation, have been allowed exemptions from this tax for new vehicles purchased within the exterior boundaries of the Fort Peck Reservation. As noted above, partial summary judgment has been entered in this case to the effect that the exemption recognized since late December 1980 is valid. Plaintiffs contend, however, that enrollment in the reservation tribes, and the situs of the purchase of a new vehicle, should not be elements of the exemption. They further argue that this court has jurisdiction to order refunds of all taxes improperly collected.

MOTOR VEHICLE PROPERTY TAX

Montana's motor vehicle property tax was collected from all individuals as a condition of registering or reregistering their motor vehicles, up until April of 1976. Shortly after the Supreme Court's decision in *Moe,* enrolled members of federally recognized Indian tribes who claimed exemptions were granted those exemptions, regardless of tribal affiliation, so long as they resided on the Fort Peck Reservation. After *Colville* was decided, and instructions were received by county officials from various State agencies, Roosevelt County began limiting the exemption to enrolled members of the Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation who resided on that reservation. As previously noted, partial summary judgment has been entered in this case to the effect that the

exemption as applied since *Colville* is valid. As with the new car tax, the plaintiffs in this action seek a declaration that *all* Indians residing on the Fort Peck Reservation are exempt from this tax, regardless of their tribal affiliation. Further, refunds are sought of all amounts improperly collected under this tax.

EXEMPTION FOR NON–ENROLLED INDIANS [2]

Plaintiffs strenuously argue that, because many of the benefits conferred by the Tribes are enjoyed by all Indians residing on the Fort Peck Reservation, whether enrolled in the Assiniboine and Sioux Tribes or not, application of these taxes to Indians residing on that reservation but not enrolled in the reservation tribes is improper. The defendants dispute that assertion, arguing that the exemption from these taxes is a right emanating from treaties with the specific tribes for whom the reservation was set aside, and as such is not available to non-members of the reservation tribes, in this case the Assiniboine and Sioux Tribes of the Fort Peck Reservation.

This court is fully convinced, despite plaintiffs' assertions to the contrary, that the decision of the United States Supreme Court in *Washington v. Confederated Tribes of the Colville Indian Reservation, supra,* 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980), governs the instant question. *Colville* involved the State of Washington's efforts to apply its cigarette and tobacco products taxes to sales by on-reservation tobacco outlets. While the Court's holding in *Colville* had several dimensions, one aspect of the case, which resolved a question left open by *Moe,* is vitally important to this court's decision in the instant case. In response to Washington's assertion that it could validly apply its sales and cigarette taxes to Indians residing on the reservation but not enrolled in the reservation tribe, the Court, in reversing the district court, found:

therefore the following discussion applies to the new car tax and the motor vehicle property tax.

2. Because the defendants assert that exemption from both taxes depends on tribal enrollment, the issues surrounding the enrollment question are essentially the same for both taxes, and

Federal statutes, even given the broadest reading to which they are reasonably susceptible, cannot be said to pre-empt Washington's power to impose its taxes on Indians not members of the Tribe. We do not so read the Major Crimes Act, 18 U.S.C. § 1153, which at most provides for federal-court jurisdiction over crimes committed by Indians on another Tribe's reservation. *Cf. United States v. Antelope,* 430 U.S. 641, 646–647, n. 7 [97 S.Ct. 1395, 1398–1399, n. 7, 51 L.Ed.2d 701] (1977). Similarly, the mere fact that non-members resident on the reservation come within the definition of "Indian" for purposes of the Indian Reorganization Act of 1934, 48 Stat. 988, 25 U.S.C. § 479, does not demonstrate a congressional intent to exempt such Indians from state taxation.

Nor would the imposition of Washington's tax on these purchasers contravene the principle of tribal self-government, for the simple reason that non-members are not constituents of the governing Tribe. For most practical purposes those Indians stand on the same footing as non-Indians resident on the reservation. There is no evidence that nonmembers have a say in tribal affairs or significantly share in tribal disbursements. We find, therefore, that the State's interest in taxing these purchasers outweighs any tribal interest that may exist in preventing the State from imposing its taxes. *Id.,* at 160–61, 100 S.Ct. at 2084–85.

Plaintiffs, in resisting the defendants' motion for summary judgment, contend that *Colville* was not fully briefed by the parties nor fully considered by the Supreme Court. Further, defendants argue, summary judgment is inappropriate in this case because they would demonstrate, at trial, that non-Assiniboine and Sioux Indians residing at Fort Peck stand on the same footing as tribal members. Once established, it is argued, the fact of such equal treatment

would compel this court to reach a conclusion differing from that reached in *Colville.*

At the conclusion of the September 7, 1982 hearing, this court informed counsel of its belief that *Colville* controlled the instant question. Counsel was advised, however, that evidentiary materials could be submitted to augment the record in this case. The plaintiffs thereafter submitted a substantial number of exhibits, including letters and affidavits. A set of stipulated facts was prepared, and filed on April 7, 1983. Plaintiffs contend that this additional evidence shows that Indians residing on the Fort Peck Reservation, who are not enrolled in the Assiniboine and Sioux Tribes, are nonetheless accorded the same treatment by the United States, the State of Montana, and the Tribes, as that accorded enrolled members of the Tribes. Because the defendants believe, based upon *Colville,* that non-enrolled Indians [3] are not, as a matter of law, exempt from either of these taxes, they contend that the additional evidence is not relevant to the issues presented in this case. While the court agrees that *Colville* decided this issue as a matter of law, and accordingly finds that summary judgment is appropriate on this aspect of the case, a brief review of the submitted evidence is useful.

Of the 9,921 residents at Fort Peck, 4,062 are Indians enrolled in the Assiniboine and Sioux Tribes, 180 are enrolled members of other recognized American Indian Tribes, and approximately 30 are of Indian descent but not enrolled in any recognized tribe. Generally, non-enrolled Indians at Fort Peck stand on the same footing as Assiniboine and Sioux tribal members in the following areas, among others: police and fire protection, low-income energy assistance, commodity food distribution, tribal detoxification and alcoholism programs, and the preference right of employment by the Tribes. The following federal benefits, among others, are available to Indians at

---

**3.** As used in this opinion, "non-enrolled" means not enrolled in the tribe or tribes governing the particular reservation on which the Indian resides. Thus, for present purposes, the non-enrolled Indian is one who is either not enrolled in any tribe, or one enrolled in a tribe other than the reservation tribe.

Fort Peck, through the Bureau of Indian Affairs, without regard to membership in the reservation tribes: grants and financing through the Housing Improvement Program under 25 C.F.R. §§ 256 et seq.; contract medical services pursuant to 42 C.F.R. §§ 36.23 et seq.; Indian child welfare assistance under 25 C.F.R. §§ 20.21, 20.22 and 20.23; and educational loans and grants under 25 C.F.R. § 40.1. Enrollment in the Assiniboine and Sioux Tribes is not taken into account when the Wolf Point and Poplar schools compute their Indian enrollment for purposes of receiving federal funds. The areas of "equal treatment" number far more than those listed here. The following rights and privileges, conversely, are limited to enrolled members of the two tribes: 1) the right to vote in tribal elections or referendums is limited to tribal members 21 years of age or older, subject to certain restrictions as to district or off-reservation residence; 2) the right to receive per capita distributions from the income of the Assiniboine and Sioux Tribes is limited to enrolled members of the Tribes; and 3) the right to inspect accounts of the properties and business transactions of the Tribes is limited to members of the Tribes and representatives of the Commissioner of Indian Affairs.

Plaintiffs' contentions that Colville was decided on an incomplete record and should not apply in this case derive primarily from their focus upon the following pronouncement from that case:

> For most practical purposes those Indians (reservation Indians not enrolled in the governing tribe) stand on the same footing as non-Indians resident on the reservation. There is no evidence that nonmembers have a say in tribal affairs or significantly share in tribal disbursements. (parenthetical added).

Colville, 447 U.S. at 161, 100 S.Ct. at 2084.

The plaintiffs assert that proof could be adduced at trial of this action which would show that on the Fort Peck Reservation, non-Assiniboine and Sioux Indians stand on the same footing as tribal members for most purposes. In other words, it is asserted that there are sufficient factual differences between the Fort Peck Reservation and the reservation involved in Colville to take this case outside the holding of Colville.

Plaintiffs' argument that Colville was neither fully briefed nor properly decided by the Supreme Court need be given little consideration.[4] The mandate in that case is clear, and it is not the province of this court to speculate as to what the Court might have decided on a different record. Further, even if the instant issue was not decided as a matter of law in Colville, and instead could be said to have turned on the particular facts of that case, such an interpretation would not help the plaintiffs here. The Supreme Court, in the language quoted above, set forth the two factors which it used to distinguish between enrolled and non-enrolled Indians: a say in tribal affairs and an entitlement to a significant share of tribal disbursements. As the stipulated facts reflect, the Indians residing at Fort Peck who are not enrolled in the governing tribes enjoy neither of those privileges. Thus, even assuming arguendo that this issue was not decided as a matter of law, and the Supreme Court was wrong in concluding that the non-enrolled Indians involved in Colville were treated more like non-Indians than enrolled tribal members, application of the criteria suggested by the Court supports the distinction urged by the State of Montana in this case. Finally, given the small number of Indians at Fort Peck affected by this distinction (non-enrolled Indians who wish to license their vehicles), the State's taxation of those individuals can hardly be said to "contravene the principle of tribal self-government." Colville, 447 U.S. at 161, 100 S.Ct. at 2084.

Though fully convinced that the distinction being drawn here is a valid one, the court adds that the Supreme Court's recent decision in United States v. New Mexico,

---

4. The court notes that members of the law firm representing plaintiffs in this action filed an amicus brief in Colville.

455 U.S. 720, 102 S.Ct. 1373, 71 L.Ed.2d 580 (1982), further supports, at least implicitly, this view. The parties and the facts in *New Mexico* differ from those present here. Significantly, however, the Court did emphasize the need for a narrow approach to the application of tax immunities, and concluded its opinion by suggesting that the expansion of tax immunities is a matter best dealt with by Congress. *Id.,* at 744, 102 S.Ct. at 1387.

■ Because *Colville* held, as a matter of law, that there exists a valid basis for distinguishing between enrolled and non-enrolled Indians, summary judgment on this issue is appropriate.[5] None of the facts which plaintiffs would hope to adduce at trial could alter the fact that these taxes can be properly collected from reservation Indians not enrolled in the governing tribes.[6]

## SITUS OF NEW CAR PURCHASE

The defendants have stipulated that enrolled Assiniboine and Sioux Indians living on the Fort Peck Reservation are exempt from payment of the new car tax, provided the vehicle is purchased on the reservation. The plaintiffs challenge this territorial component, asserting that the situs of the sale should have no bearing upon the applicability of the exemption. On the record before it, this court finds that the situs of the new car sale is not a legitimate and valid element of the exemption.

The defendants' argument is essentially that, because *Colville* and *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973) found that a state has more control over Indian activities conducted outside the reservation boundaries, enrolled Indians electing to purchase a new car off the reservation lose whatever tax immunity they would otherwise enjoy. Defendants also cite *McClanahan* as support for this position, because in that case tax immunity was extended to income earned by an Indian solely within the confines of the reservation.

The court is unpersuaded. Montana's new car tax has no territorial component. It is imposed as a precondition to use of this state's highways. § 61–3–502(1) M.C.A. (1979). As the court has noted, the exemptions to which the Indians are entitled derive from their treaties with the government. As such, they are personal to, and for the benefit of, the members of those tribes—they confer upon tribal members the right to exist on the reservation without an undue amount of governmental interference. Why should the new car tax impact an otherwise immune Indian merely because he makes his purchase off the reservation? The defendants have made no compelling arguments in favor of this requirement. Forcing the individual to purchase his new vehicle within the confines of the reservation, or face a loss of his immunity, appears to represent the classic case of elevating form over substance. It is hard to understand how the taxing authority of the

5. Plaintiffs argue that in no case other than *Colville* has the United States Supreme Court distinguished between Indians living on a reservation who are enrolled in the reservation tribe and those not so enrolled. However, the clear import of language such as that taken from *McClanahan* is that tribal affiliation *has* been deemed significant:

> Moreover, since the signing of the *Navajo* treaty, Congress has consistently acted upon the assumption that the states lacked jurisdiction over *Navajos* living on the reservation. 411 U.S. at 175 [93 S.Ct. at 1263] (emphasis supplied).

*See also, Oklahoma Tax Comm'n v. United States,* 319 U.S. 598, 63 S.Ct. 1284, 87 L.Ed. 1612 (1943) (unsuccessful effort to tax three *members* of the Five Civilized Tribes); *Childers*

*v. Beaver,* 270 U.S. 555, 46 S.Ct. 387, 70 L.Ed. 730 (1926) (unsuccessful attempt to tax full-blooded Quapaw *tribal member* ).

6. The court wonders, if enrollment was not the deciding factor, what criteria could be utilized by the State in applying the exemption. Should it be membership in *any* tribe, or a minimum quantity of Indian blood, or the mere assertion that one is an Indian, or the claim that one is an Indian and is recognized in his community as such? Or should the exemption apply to anyone who has adopted the Indian way of life? As a practical matter, application of such criteria could create an administrative nightmare, and the likelihood that unfairness would result is substantial.

State of Montana would be undermined by allowing Indians exempt from the new car tax the option of purchasing their vehicles off the reservation, so long as they properly apply for and prove their entitlement to the new car tax exemption.

■ As a practical matter, it is hard to imagine how local authorities can equitably and uniformly administer a requirement that the purchase price of a new car be exchanged on the reservation, or that the sale in some way be consummated there. Because the court is unpersuaded that the situs of the sale should have anything to do with the applicability of a treaty-based exemption, and because such a requirement would likely lead to inequity, if not confusion, the court finds that the situs of a new car purchase is not an element of the tax exemption. Further input is invited on this matter: the defendants may wish to file a motion asking this court to reconsider this aspect of the case. If filed, such motion should include argument on the issue of why the situs of the new car sale is a valid component of the exemption. In addition, the defendants should set forth in detail a procedure which could be employed to effectuate the uniform and workable administration of the territorial requirement. Unless and until this court is persuaded that the situs of the new car sale is a valid element of the exemption, the court's holding on this aspect of the case will stand.

## JURISDICTION OF THESE CLAIMS

The defendants contend that the claims of the individual Indians in this case are barred by the Tax Injunction Act, 28 U.S.C. § 1341. That section provides:

> The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient reme-

dy may be had in the courts of such State.

■ In *Moe*, the Supreme Court held that a suit by an Indian tribe proceeding under 28 U.S.C. § 1362,[7] to enjoin the enforcement of a state tax, was properly grounded jurisdictionally. 425 U.S. at 474–5, 96 S.Ct. at 1641–2. Thus, in this case, this court has jurisdiction to hear the claims of the Tribes for declaratory and injunctive relief, and for refunds, pursuant to § 1362. The defendants aver that the Tribes have failed to state a claim with respect to the refunding of any taxes: the amended complaint of July 6, 1981, is totally devoid of specific references to amounts paid by the Tribes as a condition of registering or re-registering specific tribal vehicles. In contrast, the allegations by the individual plaintiffs are quite specific. The Tribes have had two opportunities to state a claim for refunds allegedly due on tribal vehicles. For whatever reason, they have failed to set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8(a), F.R.Civ.P. There being no sufficient allegation that the Tribes have been improperly taxed on tribal vehicles, the defendants' position is well taken. The Tribes' general claims for refunds are dismissed for failure to state a claim.

The more significant issue in this case is whether this court has jurisdiction over the claims of the individual Indian plaintiffs. In light of the grant of partial summary judgment heretofore entered pursuant to stipulation, it is apparent that both of the taxes at issue have been improperly collected from certain individuals. It is equally clear, however, that as to the claims of these individual Indians, this court has no subject matter jurisdiction to act.[8]

---

7. That section provides:

The district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States.

8. It makes little difference that the individual plaintiff's claims regarding the propriety of these taxes are not viable, since no one disputes that the Tribes can challenge the validity of the taxes as they are being applied. *See, Moe v. Confederated Salish and Kootenai Tribes, supra,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976); 28 U.S.C. § 1362. As noted,

Analysis must begin with the Tax Injunction Act. The plaintiffs concede that "generally speaking 28 U.S.C. § 1341 provides a bar to suits in the district courts which seek to 'enjoin, suspend, or restrain the assessment, levy or collection of any tax under State law'" where an adequate state remedy is available in state court. To this jurisdictional restriction the plaintiffs advance three arguments which assertedly take the individual claims here outside of § 1341: 1) *parens patriae* doctrine; 2) co-plaintiff doctrine; and 3) their contention that the Tax Injunction Act does not apply to refund claims.

## TRIBE AS PARENS PATRIAE

■ Plaintiffs, intermingling language from *Moe* with their interpretation of the *parens patriae* (parent of the country) doctrine, argue that the jurisdictional bar to the claims of the individual Indians can be avoided by allowing the Tribes to press those claims on the individual's behalf. The Tribes, of course, avoid the § 1341 bar by virtue of § 1362. The question remains whether the prohibition of § 1341 can also be bypassed by the individual plaintiffs here.

The genesis and parameters of the *parens patriae* doctrine are uncertain. There is a paucity of cases discussing that doctrine in the context in which it is proposed here. The Tribes allege that their sovereign status allows them to bring suit on behalf of those within their jurisdiction, to the same extent as could the United States or a state. The court is convinced, however, that the entity purporting to advance the claim must be acting on behalf of the collective interests of *all* its citizens. *See, e.g., Louisiana v. Texas,* 176 U.S. 1, 19, 20 S.Ct. 251, 257, 44 L.Ed. 347 (1900). Here, the proposed claim is on behalf only of those Indians seeking refunds because they have been improperly subjected to these taxes, and those Indians who might, but for this lawsuit, continue to be wrongfully subjected to them. Given the fact that partial summary judgment decrees have significantly narrowed the number of Indians subject to these taxes, it can hardly be said that this lawsuit is on behalf of the interests of the entire Fort Peck constituency. The Supreme Court many years ago looked with disfavor on the attempted use of the *parens patriae* doctrine for the benefit of a limited class, where that doctrine was being used to establish jurisdiction. *Oklahoma v. Atchison, Topeka & Santa Fe Ry. Co.,* 220 U.S. 277, 31 S.Ct. 434, 55 L.Ed. 465 (1911).

Essentially, this court is simply unpersuaded by plaintiffs' *parens patriae* argument. The clear mandate of the Tax Injunction Act should not be so easily sidestepped, and the cases of *Dillon v. State of Montana,* 634 F.2d 463 (1980), and *Navajo Tribal Utility Auth. v. Arizona Dept. of Revenue,* 608 F.2d 1228 (1979), support this restrictive view of § 1341. In the latter case, the Ninth Circuit concluded "(t)he Supreme Court in *Moe* (did not) suggest that section 1362 provided for jurisdiction beyond the plain language of the statute, that is, beyond Indian tribes or bands." *Id.,* at 1231.

The authority of the Tribes to maintain this action derives from the clear language and purpose of § 1362, rather than from the Tribes' sovereign status. The expansive reading of § 1362, advocated by the plaintiffs, is not warranted in this case.

## CO–PLAINTIFF OR "UMBRELLA" DOCTRINE

■ Citing *United States v. Arlington Co.,* 326 F.2d 929 (4th Cir.1964), the plaintiffs assert that the individual Indians may join in this action as co-plaintiffs with the Tribes—that they somehow can "find shelter" under the Tribes' § 1362 umbrella.[9] In

---

the more important issue is whether this court has jurisdiction to hear the claims of the individuals for refunds.

**9.** *Arlington Co.* involved an action by the United States and a naval officer challenging Virginia's ability to tax the personal property of that officer. Besides the fact that Indian taxa-

tion cases turn on questions and values unique to this difficult area of law, the Fourth Circuit's disposition of *Arlington Co.* is not particularly persuasive in light of Ninth Circuit cases on this issue, discussed *infra.*

light of several decisions by the Ninth Circuit concerning Indian taxation, this argument is not persuasive.

Most recently, the Ninth Circuit in *Dillon* held that the Tax Injunction Act deprives federal courts of jurisdiction over suits by individual Indians. 634 F.2d at 469. Plaintiffs assert that because the Indians in *Dillon* were not joined by the Tribe in pressing their claims, the *Dillon* court's emphasis on the unavailability of the federal forum to individuals seeking refunds of state taxes has no bearing upon the instant question. Not only does this court disagree with that contention, but it is apparent from an earlier Ninth Circuit case that the exception carved out by § 1362 extends only to Tribes, and not to claims made by individual Indians. In *Quinault Tribe of Indians v. Gallagher,* 368 F.2d 648 (9th Cir.1966), the Quinault Tribe, and several individual members of that tribe, sought declaratory and injunctive relief on the question of the State of Washington's authority to enforce its criminal and civil laws on the reservation. Initially, the Court of Appeals upheld the district court's dismissal of both the Tribes' and the individual's suits, because the matter in controversy did not exceed the requisite jurisdictional amount. *Id.,* at 655. On rehearing, the court held that the newly-enacted § 1362 conferred federal court jurisdiction "(i)nsofar as plaintiff Indian tribe is concerned." *Id.,* at 656. Significantly, however, the court declined to extend federal jurisdiction to the individual claims, stating unequivocally "As to the eight personal plaintiffs, however, the new jurisdictional statute has no application...." *Id.* This language convinces the court that a co-plaintiff, "umbrella" argument should be rejected.[10] Plaintiffs certainly have cited no authority which would compel acceptance of this approach, or would justify this court's circumvention of the clear § 1341 mandate. If Congress had intended § 1362 to apply to parties other than tribes or bands, they could have easily so legislated.

Finally, the Court of Appeals noted in the *Navajo* case that statutory jurisdictional doubts are to be resolved against federal jurisdiction. 608 F.2d at 1233, citing *F. & S. Construction Co. v. Jensen,* 337 F.2d 160, 161 (10th Cir.1964). Because § 1362 is not ambiguous insofar as its application being restricted to Indian tribes, the liberal construction in favor of Indians discussed in *Bryan v. Itasca Co.,* 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976) need not be employed here. *See, Navajo Tribal Utility Auth. v. Arizona Dept. of Revenue, supra,* 608 F.2d at 1233.

## APPLICABILITY OF § 1341 TO REFUND ACTIONS

The individual plaintiffs' third effort to avoid the § 1341 jurisdictional bar, at least as to their refund claims, comes in the form of the argument that the bar restricts only the equitable powers of this court. Suits for refund of state taxes, they argue, are not barred by the Tax Injunction Act. The plaintiffs argue that Congress intended for the Act to prevent the disruption of state and local finances, which could result from large-scale withholding of taxes pending the determination of a federal court suit. *Fair Assessment in Real Estate Assoc. v. McNary,* 454 U.S. 100, 102 S.Ct. 177, 70 L.Ed.2d 271 (1981) (Brennan, J. concurring). While this assessment of the purpose behind the Act seems accurate, the court is not persuaded that the exception to the Act urged in this case is permissible.

In *Kelly v. Springett,* 527 F.2d 1090 (9th Cir.1975), the Ninth Circuit was faced with the very questions at issue here. *Kelly* involved a suit by a taxpayer seeking to recover several thousand dollars seized under a jeopardy assessment of the California Franchise Tax Board. After finding that

---

**10.** Plaintiffs would discount the utility of *Quinault* because the court's initial basis for a finding of no jurisdiction over the individual claims was that the jurisdictional amount was not present. Thirteen years later, however, in the *Navajo* case, the Ninth Circuit, while squarely addressing the Tax Injunction Act impediment, cited *Quinault* for the proposition that "section 1362 'has no application' to the claims of individual members of Indian tribes or bands." 608 F.2d at 1231.

the 42 U.S.C. § 1983 suit was essentially a claim for a tax refund, the court held:

> Bland v. McHann, 463 F.2d 21 (CA5 1972), cert. denied 410 U.S. 966, 93 S.Ct. 1438, 35 L.Ed.2d 700 (1973), stands for the tenet that § 1341 applies to suits for refunds, as well as to anticipatory relief. The Bland court also held that an action for refund was an integral part of state tax administration and that there was no reason to bifurcate the state remedy. Id. at 27. We agree with both conclusions.

Id., at 1094. The Court of Appeals in Kelly affirmed the lower court, which had granted summary judgment against the taxpayer.

Certainly Kelly is dispositive of the instant issue. Significantly, the Ninth Circuit discussed Kelly at length in the Dillon opinion, and strenuously reaffirmed the view that tax refund suits implicate § 1341. Dillon v. State of Montana, supra, 634 F.2d at 465–6. This court agrees with the reasoning of Dillon, that refund suits are just as intrusive as suits for declaratory and injunctive relief. Id. As such, there is no logical reason for allowing refund suits to escape the § 1341 barrier, while applying that statute to declaratory and injunctive claims.

Plaintiffs recognize the applicability of Kelly and Dillon, but insist that the Ninth Circuit would reach a different result in this case if it were to consider the legislative history of the Tax Injunction Act, as it was discussed in a concurring opinion in McNary, and if the Court of Appeals would apply the rationale set forth in Fulton Market Cold Storage Co. v. Cullerton, 582 F.2d 1071 (7th Cir.1978), cert. denied, 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82 (1979). First, the Supreme Court, in McNary, rejected the Fulton Market reasoning, at least by implication. 454 U.S. at 102 n. 2, 102 S.Ct. at 179 n. 2. Further, plaintiffs' legislative history argument should be rejected on the simple basis that its viability rests

upon the implication that the Ninth Circuit has either failed to consider Congress' intent in passing § 1341, or has construed that intent improperly. More importantly, however, in light of the unequivocal language of Kelly and the equally vehement reaffirmation of that case in Dillon, this court declines the plaintiffs' invitation to speculate upon what the Court of Appeals would or might do, if given the benefit of subsequent decisions deemed important by the plaintiffs.[11]

■ The individual plaintiffs have attempted to persuade this court that their claims somehow evade the restrictions of the Tax Injunction Act. In rejecting the invitation to expand the obviously limited jurisdiction of this court, the necessity that state and local governments be permitted to assess and collect taxes with a minimum of federal interference weighs heavily on this court's mind. See, Perez v. Ledesma, 401 U.S. 82, 127–129 n. 17, 91 S.Ct. 674, 698–699 n. 17, 27 L.Ed.2d 701 (Brennan, J. concurring and dissenting). This is especially true in this age where local governments, and indeed governments at all levels, face fiscal ruination at every turn. Obviously, the bad state of government fiscal affairs is not adequate justification for the rejection of legitimate claims for refunds of improperly collected taxes. The individual plaintiffs, however, make no assertion that the remedies provided under Montana law are not adequate to afford them a means to redress their grievances. In this case, of course, such an assertion would be questionable, if not premature, since none of the named plaintiffs appear to have even attempted to properly follow Montana's protest and refund procedure. Because there is no allegation or supporting evidence that Montana's tax refund remedy is not "plain, speedy and efficient", I hold that the claims of the individual plaintiffs in this case are barred by 28 U.S.C. § 1341.[12]

11. In Dillon, the Court of Appeals rejected the view that Fulton County stood for the proposition that refund suits in Federal courts escape the § 1341 jurisdiction bar. 634 F.2d at 467, n. 4.

12. After the final briefs on the cross motions for summary judgment were submitted, this court ordered further argument on the issues, in light of Northern Cheyenne Tribe v. Adsit, 668 F.2d 1080 (9th Cir.1982), petition for cert.

CONCLUSION AND ORDER

Various items of discovery have been filed in this case, and further factual inquiry is not necessary to resolve the issues herein. Because each issue can now be decided as a matter of law, disposition of this case by summary judgment is appropriate. In light of the above discussion,

IT IS HEREBY ORDERED AND ADJUDGED:

1. That Indian persons residing on the Fort Peck Indian Reservation in Montana, who are not enrolled in the Assiniboine and Sioux Tribes, are not exempt from payment of Montana's new car tax or motor vehicle property tax;

2. That Indians or Tribes who are exempt from payment of Montana's new car tax shall not be required to purchase their vehicles on the reservation as a condition of maintaining their exempt status;

3. That the claims of the Tribes for refunds of taxes paid be, and the same hereby are, DISMISSED, for failure to state a claim upon which relief can be granted;

4. That the claims of the individual plaintiffs, for declaratory and injunctive relief, and for refunds of taxes paid be, and the same hereby are, DISMISSED, for want of jurisdiction.

IT IS FURTHER ORDERED that the parties shall advise the court if any other matters need to be resolved in this action.

LET JUDGMENT BE ENTERED ACCORDINGLY.

pending. In that case, Montana's "disclaimer" provision was construed in a manner which precluded its state courts from adjudicating Indian water rights, leaving open only the federal forum. After consideration of counsels' arguments, this court finds that *Adsit* does not affect the outcome of this case. This is so primarily because all decisions examined by the court, other than *Adsit* and a companion case, have held that the disclaimer language disclaims only *proprietary* interests of a state, but does not affect a state's *regulatory* authority.

*See, e.g., Organized Village of Kake v. Egan,* 369 U.S. 60 [82 S.Ct. 562, 7 L.Ed.2d 573] (1962); *Mescalero Apache Tribe v. Jones,* 411 U.S. 145 [93 S.Ct. 1267, 36 L.Ed.2d 114] (1973); *White Mountain Apache Tribe v. Arizona,* 649 F.2d 1274 (9th Cir.1981); *Jicarilla Apache Tribe v. United States,* 601 F.2d 1116 (10th Cir.1979), *cert. denied,* 444 U.S. 995, 100 S.Ct. 530, 62 L.Ed.2d 426 (1979). Further, the Ninth Circuit seemed to limit its holding in *Adsit* to water rights adjudications. 668 F.2d at 1087.