798 F.2d 1205
 WHITE MOUNTAIN APACHE TRIBE, an Indian tribe established
pursuant to Executive Order, et al., Plaintiffs-Appellees,
v.
Jack WILLIAMS, Governor of the State of Arizona, et al., Defendants,
and
John McLaughlin, Chairman, Arizona State Transportation
Board, et al., Defendants-Appellants.
 No. 81-5348.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 6, 1982.
Decided Feb. 7, 1984.
Petition for Rehearing Granted April 25, 1984.
Reargued and Resubmitted June 18, 1984.
Filed Dec. 19, 1985.
As Amended on Denial of Rehearing and Rehearing En Banc Aug. 20, 1986.
 
 Neil Vincent Wake, Beus, Gilbert, Wake & Morrill, Phoenix, Ariz., for plaintiffs-appellees.
 Anthony B. Ching, Phoenix, Ariz., for defendants-appellants.
 Appeal from the United States District Court for the District of Arizona.
 AMENDED OPINION
 Before FLETCHER* and NORRIS, Circuit Judges, and BURNS,** District Judge.
 NORRIS, Circuit Judge:
 
 
 1
 This appeal presents the question whether Pinetop Logging Company ("Pinetop") and the White Mountain Apache Tribe (the "Tribe") have stated a claim under 42 U.S.C. Sec. 1983[1] for which attorneys's fees are available under the Civil Rights Attorney's Fees Awards Act, 42 U.S.C. Sec. 1988 (1976).[2]
 
 
 2
 * The facts of this case are set out more fully in White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980). In brief, the White Mountain Apache Tribe, which inhabits a reservation in Arizona, organized a tribal enterprise to harvest timber. In 1969 the enterprise entered into a contract with Pinetop Logging Company which provided that Pinetop would perform logging operations on the reservation. Id. at 139, 100 S.Ct. at 2581. In 1971, the Arizona Highway Department and the Arizona Highway Commission assessed a motor carrier license tax and a use fuel tax against Pinetop for activities it performed pursuant to the contract. Id. at 139-40, 100 S.Ct. at 2581-82. Pinetop paid the taxes under protest, and then brought suit in state court to recover them. Id. at 140, 100 S.Ct. at 2581.
 
 
 3
 In December 1973, after the Tribe had agreed to reimburse Pinetop for the assessed taxes, id. at 140, 100 S.Ct. at 2581, Pinetop and the Tribe brought suit in federal court, seeking a declaratory judgment and an injunction to prevent any further imposition of state taxes against Pinetop.[3] In their federal complaint, Pinetop and the Tribe contended that federal law preempted the state tax laws and that the tax violated their rights to due process and equal protection.
 
 
 4
 Shortly after commencement of the federal action, the State of Arizona filed a motion requesting the district court to abstain on the ground that "the Arizona tax statutes here in question may be susceptible to an authoritative construction by the state courts in the pending state court action that would avoid or modify the Federal constitutional questions raised." The district court granted the motion, relying on the Supreme Court's decision in Railroad Commission v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), and at the same time granted a consent temporary restraining order forbidding the state agencies to assess further taxes against Pinetop.
 
 
 5
 Although not required to do so, Pinetop and the Tribe then elected to submit their federal preemption claim to the Arizona courts along with the questions of state law. In May 1975, the Arizona Superior Court rejected all their claims, state and federal, and entered judgment for the state. The federal district court then dismissed the federal action sua sponte. In early 1976, however, upon the motion of Pinetop and the Tribe, the district court vacated the dismissal order and entered a consent preliminary injunction pending final outcome of the state proceedings. In 1978, the Arizona Court of Appeals affirmed the state trial court judgment, characterizing the Tribe's arguments as "pure sophistry." White Mountain Apache Tribe v. Bracker, 120 Ariz. 282, 290, 585 P.2d 891, 899 (Ct.App.1978), rev'd, 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980).
 
 
 6
 After the Arizona Supreme Court declined review, the state returned to federal district court with a motion to quash the consent preliminary injunction and to dismiss the federal action. The district court denied the state's motion. The United States Supreme Court then reversed the Arizona Court of Appeals, holding that the state taxes were preempted because the comprehensive federal regulatory scheme governing the harvest and sale of tribal timber had occupied the field and because the state taxes would interfere with federal goals and policies. 448 U.S. at 151, 100 S.Ct. at 2587. Armed with a favorable state court judgment on their federal claims, Pinetop and the Tribe then returned to the district court seeking a declaratory judgment, a permanent injunction and attorney's fees. The district court granted all the relief sought, including attorney's fees of $206,012.07. The state appeals. We reverse.
 
 II
 
 7
 We first address the question whether Pinetop and the Tribe have stated a claim under Sec. 1983 for which attorney's fees are available under Sec. 1988. Pinetop and the Tribe argue that a claim of preemption of the state's power to tax Pinetop's logging operations on the reservation constitutes a claim of deprivation of "rights, privileges, or immunities secured by the Constitution and laws" within the meaning of Sec. 1983. The Supreme Court decided in Bracker, supra, that the federal laws regulating the harvest and sale of tribal timber did preempt the Arizona tax statutes, reasoning that
 
 
 8
 Where ... the Federal Government has undertaken comprehensive regulation of the harvesting and sale of tribal timber, where a number of policies underlying the federal regulatory scheme are threatened by the taxes respondents seek to impose, and where respondents are unable to justify the taxes except in terms of a generalized interest in raising revenue, we believe that the proposed exercise of state authority is impermissible.
 
 
 9
 Bracker, 448 U.S. 136, 151, 100 S.Ct. 2578, 2587, 65 L.Ed.2d 665 (1980). Although the Court acknowledged that "traditional notions of Indian self-government ... provided an important 'backdrop' " for its analysis, 448 U.S. at 143, 100 S.Ct. at 2583, it explicitly "based [its decision] on the preemptive effect of the comprehensive federal regulatory scheme" governing the timber harvest. Id. at 151 n. 15, 100 S.Ct. at 2588 n. 15.
 
 
 10
 The question whether the Supremacy Clause (U.S. Const. art. VI cl. 2) may be used as a sword in bringing a Sec. 1983 action is, of course, different from that decided by the Supreme Court in Bracker --whether the Supremacy Clause may be invoked as a shield against the imposition of state taxes on tribal logging operations heavily regulated by the federal government. It is the former question that we must address.
 
 
 11
 Pinetop and the Tribe argue that because the federal laws that regulate timber operations on tribal lands are intended to benefit the Tribe, the laws may serve as the basis for a Sec. 1983 claim. That the Tribe benefits from the federal timber regulations, however, is not dispositive of the issue. In this case, Pinetop and the Tribe did not prevail in the Supreme Court on a theory that the state had violated any of the federal laws or regulations governing logging operations on tribal lands. Rather, the Supreme Court in Bracker reasoned that state taxes were preempted because the federal government had pervasively regulated tribal logging operations and because state taxation would interfere with the goals and purposes of the federal regulatory scheme.
 
 
 12
 Thus the question presented is whether the Tribe's preemption claim, based on federal occupation of a regulatory field and inconsistency of state action with federal goals and policies, will support a civil rights action under Sec. 1983.
 
 
 13
 * The Supreme Court has never directly addressed the question whether the Supremacy Clause creates "rights, privileges or immunities" within the ambit of Sec. 1983. In Chapman v. Houston Welfare Rights Organization, 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979), however, the Supreme Court did hold that the Supremacy Clause is not a substantive constitutional provision that creates rights within the meaning of 28 U.S.C. Sec. 1343(3). Id. at 612-15, 99 S.Ct. at 1913-15.[4] The Court noted, "even though that Clause is not a source of any federal rights, it does 'secure' federal rights by according them priority whenever they come in conflict with state law. In that sense all federal rights, whether created by treaty, by statute, or by regulation are 'secured' by the Supremacy Clause." Id. at 613, 99 S.Ct. at 1913-14. Under Chapman, therefore, the Supremacy Clause, standing alone, 'secures' federal rights only in the sense that it establishes federal-state priorities; it does not create individual rights, nor does it 'secure' such rights within the meaning of Sec. 1983.
 
 
 14
 The primary function of the Supremacy Clause is to define the relationship between state and federal law. It is essentially a power conferring provision, one that allocates authority between the national and state governments; thus, it is not a rights conferring provision that protects the individual against government intrusion. The distinction between the two categories of constitutional controls has been enunciated by Professor Choper:
 
 
 15
 When a litigant contends that the national government (usually the Congress, but occasionally the executive, either alone or in concert with the Senate) has engaged in activity beyond its delegated authority, or when it is alleged that an attempted state regulation intrudes into an area of exclusively national concern, the constitutional issue is wholly different from that posed by an assertion that certain government action abridges a personal liberty secured by the Constitution. The essence of a claim of the latter type--which falls into the individual rights category of constitutional issues ...--is that no organ of government, national or state, may undertake the challenged activity. In contrast, when a person alleges that one of the federalism provisions of the constitution has been violated, he implicitly concedes that one of the two levels of government--national or state--has the power to engage in the questioned conduct. The core of the argument is simply that the particular government that has acted is the constitutionally improper one. To put it another way, a federalism attack on conduct of the national government contends that only the states may so act; a federalism challenge to a state practice asserts that only the central government possesses the exerted power; neither claim denies government power altogether.
 
 
 16
 J. Choper, Judicial Review in the National Political Process, 174-75 (1980) (quoted with approval in United Nuclear Corp. v. Cannon, 564 F.Supp. 581 (D.R.I.1983) and Consolidated Freightways v. Kassel, 556 F.Supp. 740, 746 (S.D.Iowa 1983) aff'd 730 F.2d 1139 (8th Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 126, 83 L.Ed.2d 68 (1984)).
 
 
 17
 We believe that Sec. 1983 was not intended to encompass those Constitutional provisions which allocate power between the state and federal government. See Consolidated Freightways v. Kassel, supra, 730 F.2d at 1146 & n. 16. The following excerpt from a speech by Representative Shellabarger, a leading proponent of the 1871 Act, confirms the limited intentions of the framers of the Sec. 1983:
 
 
 18
 Most of the provisions of the Constitution which restrain and directly relate to the States, such as those in tenth section of first article, that "no State shall make a treaty," "grant letters of marque", "coin money," "emit bills of credit," & c., relate to the divisions of the political powers of the State and General Governments. They do not relate directly to the rights of persons within the States and as between the States and such persons therein. These prohibitions upon the political powers of the States are of such a nature that they can be, and even have been, when the occasion arose, enforced by the courts of the United States declaring void all State acts of encroachment on Federal powers. Thus, and thus sufficiently, has the United States "enforced" these provisions of the Constitution. But there are some that are not of this class. These are where the court secures the rights or liabilities of persons within the States, as between such persons and the States.
 
 
 19
 Cong.Globe, 42d Cong. 1st Sess., App. 69 (1871). As the Eighth Circuit has observed, "the implication of Rep. Shellabarger's statement is that Sec. 1983 was enacted to provide a remedy for the latter category of constitutional violation he mentions, and not the former." Consolidated Freightways v. Kassel, supra, 730 F.2d at 1146 n. 16.
 
 
 20
 Following the lead of the Supreme Court in Chapman and the framers of Sec. 1983, the District of Rhode Island has answered in the negative the question whether the Supremacy Clause will support an action based on Sec. 1983. In United Nuclear Corp. v. Cannon, 564 F.Supp. 581 (D.R.I.1983), a utility sought fees under Sec. 1988 after successfully challenging on preemption grounds a state statute imposing a bonding requirement on a nuclear power generating facility. The court there held that a successful Supremacy Clause challenge to state legislation could not serve as the basis for a Sec. 1983 action, and hence attorney's fees were not available under Sec. 1988. Id. at 585-87. The Eleventh Circuit reached the same conclusion in a decision affirming the dismissal of a Sec. 1983 action: "The sole cause of the unconstitutionality was the supremacy clause. Therefore Pirolo is not entitled to a Sec. 1983 remedy for enforcement of the ordinances." Pirolo v. City of Clearwater, 711 F.2d 1006, 1011 (11th Cir.), reh'g denied, 720 F.2d 688 (11th Cir.1983).
 
 
 21
 An analogous question is posed by the invocation of Sec. 1983 in cases based on the dormant Commerce Clause, another constitutional provision that has as its primary function the allocation of power between national and state governments. The most extensive treatment of the issue was provided by the Eighth Circuit in Consolidated Freightways v. Kassel, supra, a case in which a trucking firm sought Sec. 1988 attorney's fees based on its successful dormant Commerce Clause challenge to an Iowa statute banning 65-foot twin trailer trucks. The Eighth Circuit held that
 
 
 22
 Although the Commerce Clause differs from the Supremacy Clause in that the Commerce Clause is a specific grant of legislative power to Congress, the two clauses are analogous in the sense that both clauses limit the power of a state to interfere with areas of national concern. Just as the Supremacy Clause does not secure rights within the meaning of Sec. 1983, neither does the Commerce Clause.
 
 
 23
 Id. at 1144. The Eighth Circuit's reasoning implies that the Supremacy Clause alone will not support a Sec. 1983 action.
 
 
 24
 A similar question was addressed in Connor v. Rivers, 25 F.Supp. 937 (N.D.Ga.1938), aff'd, 305 U.S. 576, 59 S.Ct. 359, 83 L.Ed. 363 (1939). There, the district court decided that a dormant Commerce Clause claim did not provide jurisdiction under Sec. 1343(3)--the provision for federal jurisdiction over civil rights cases irrespective of the amount in controversy--based on an analysis of the history of Sec. 1983.[5] Id. at 938. Because Connor was decided at a time when the general federal question jurisdictional provision contained an amount in controversy provision, the suit could only be maintained in federal court if it was maintainable as a civil rights action under Sec. 1343(3). The Supreme Court affirmed Connor in a one sentence per curiam opinion noting the lack of the requisite jurisdictional amount in controversy. Connor reinforces the conclusion we draw from Chapman: power conferring provisions of the Constitution do not create "rights, privileges, or immunities" within the meaning of Sec. 1983. Although there are federal court decisions that have held or assumed that the dormant Commerce Clause does support an action under Sec. 1983,[6] we find them unpersuasive because they do not undertake a substantial analysis of the issue. See Consolidated Freightways Corp. v. Kassel, 556 F.Supp., at 744-45.
 
 
 25
 We thus come down on the side of the weight of authority that preemption of state law under the Supremacy Clause--at least if based on federal occupation of the field or conflict with federal goals--will not support an action under Sec. 1983, and will not, therefore, support a claim of attorney's fees under Sec. 1988.[7]
 
 B
 
 26
 Pinetop and the Tribe do not directly confront the question whether the actual ground on which the decision in Bracker was made--preemption based on federal "occupation of the field" and "conflict with federal goals"--will support a Sec. 1983 action. Rather, their argument seems to assume that there is a direct conflict between Arizona's tax and the federal regulations governing timbering on tribal lands. Thus, the Tribe's argument emphasizes the statutory scheme regulating logging operations on tribal lands--an emphasis that would be appropriate were this a direct conflict case. Because the Arizona tax does not directly violate any federal law or regulation, the Tribe's argument does not confront the crucial issue.
 
 
 27
 In developing their argument, Pinetop and the Tribe rely on Maine v. Thiboutot, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), in which the Court held that plaintiffs could recover in an action grounded on state violations of the Social Security Act because "the Sec. 1983 remedy broadly encompasses violations of federal statutory as well as constitutional law." Id. at 4, 100 S.Ct. at 2504. Unlike the situation in Thiboutot, no federal statute or regulation was violated by the Arizona tax on Pinetop's logging operation. Moreover, although some courts broadly interpreted the Thiboutot language to mean that Sec. 1983 encompassed all federal statutes, see, e.g., Yapalater v. Bates, 494 F.Supp. 1349, 1358 (S.D.N.Y.1980), aff'd, 644 F.2d 131 (2d Cir.1981), cert. denied, 455 U.S. 908, 102 S.Ct. 1255, 71 L.Ed.2d 447 (1982), the Supreme Court has since recognized that not all federal statutes secure rights within the meaning of Sec. 1983. See Middlesex County Sewerage Authority v. National Sea Clammers Ass'n, 453 U.S. 1, 19, 101 S.Ct. 2615, 2625, 69 L.Ed.2d 435 (1981); Pennhurst State School & Hospital v. Halderman, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981).
 
 
 28
 Recognizing the Supreme Court's limitation of Thiboutot imposed by Sea Clammers and Pennhurst, Pinetop and the Tribe contend that our decision in Boatowners and Tenants Association v. Port of Seattle, 716 F.2d 669 (9th Cir.1983) supports their position. In Boatowners, an association of pleasure craft owners charged that the manner of operation of a municipal marina violated the River and Harbor Improvements Act, 33 U.S.C. Secs. 540-633 (1982), and thereby constituted a deprivation of federal statutory rights cognizable under Sec. 1983. We found that although pleasure craft owners certainly benefitted from the general navigational improvements fostered by this federal scheme, "there is no indication that the statute was intended to benefit specially the pleasure craft owners ... nor that Congress intended to confer federal rights on [them]." Id. at 673 (footnote omitted). Accordingly, we held that the pleasure craft owners as a class had no "enforceable rights" as required by Pennhurst and Middlesex County for maintaining a Sec. 1983 action. Pinetop and the Tribe argue that they are "specially benefitted" by the federal laws and regulations governing timber operations on tribal lands. Thus, they contend that Supremacy Clause preemption by those laws and regulations creates a "right, privilege or immunity" within the meaning of Sec. 1983.[8]
 
 
 29
 The relevant focus for inquiry, however, is not primarily whether the regulatory scheme was designed to benefit the Indians. Indeed it may have been so designed. Rather the focus must be on the basis of the Supreme Court's decision in Bracker --preemption pursuant to the Supremacy Clause. So directed, our inquiry leads to the conclusion that the Bracker decision is grounded not on individual rights but instead on considerations of power --the division of authority between the states and the national government. As the Court noted, "At the most general level, the taxes would threaten the overriding federal objective of guaranteeing Indians that they will 'receive ... the benefit of whatever profit [the forest] is capable of yielding....' " Bracker, supra, 448 U.S. at 149, 100 S.Ct. at 2586 (citation omitted) (emphasis added). The court continued: "In addition the taxes would undermine the Secretary's ability to make the wide range of determinations committed to his authority concerning the setting of fees and rates with respect to the harvesting and sale of tribal timber." Id. (emphasis added) Hence, the focus of concern in Bracker is state interference with federal policy objectives and the free exercise of authority by federal officials--not individual or tribal rights.
 
 
 30
 Moreover, the Tribe's exemption from state taxation of its timber business does not implicate individual rights; rather the exemption derives from its status as a sovereign.[9] See Bracker, 448 U.S. at 148, 100 S.Ct. at 2586. Nor did the federal legislation create in the Tribe any new interest in the timber; the timber was already "owned by the United States for the benefit of the Tribe...." Id. at 138, 100 S.Ct. at 2581. The central thrust of the legislation is merely to vest in the Secretary of the Interior authority to regulate the business of harvesting and selling the timber. See 25 U.S.C. Secs. 406-407 (1982). In exercising that authority, the Secretary, of course, is required to base his decisions "upon a consideration of the needs and best interests" of the tribal owner. Id. Sec. 406(a). However, the critical inquiry--as the Supreme Court made particularly clear in Sea Clammers --is whether there is any basis for the judiciary to infer a congressional intent to create rights enforceable under Sec. 1983. 453 U.S. at 19-20, 101 S.Ct. at 2625-26. We find no basis for inferring such an intent in this case. For the purpose of applying Sec. 1983 doctrine as enunciated in Thiboutot and its progeny, we see nothing remarkable about the fact that Congress intended the federal regulation to protect the interests of the beneficial owner of the timber. Indeed, the kind of regulatory legislation involved in this case is analogous to that involved in Boatowners where we also found no "enforceable rights." 716 F.2d at 673-74. There it was the regulation of municipal marinas; here it is the regulation of tribal timber business.
 
 
 31
 In sum, the Arizona tax on Pinetop's logging operations did not violate any federal statute. Nor is the existence of a federal "goal" or "policy", standing alone, sufficient to create a right cognizable under Sec. 1983. Rather, the tax ran afoul of the Supremacy Clause because it was deemed to interfere in a general way with the authority and policies of the federal government. To be sure, the Supremacy Clause shielded the Tribe's timber business from state taxation, giving the Tribe a federal defense to any action brought by the state to collect the taxes; it does not follow, however, that in enacting the regulatory legislation, Congress intended to confer on the Tribe the right to use Sec. 1983 as a sword to enjoin the collection of state taxes. The Tribe's Sec. 1983 claim, rooted as it is in the power conferring function of the Supremacy Clause, must fail.
 
 
 32
 We therefore hold that the preemption claim of Pinetop and the Tribe does not give rise to a claim cognizable under Sec. 1983. Accordingly, we conclude that the preemption claim does not support an award of attorney's fees under Sec. 1988.
 
 III
 
 33
 * Plaintiffs argue in the alternative that even if their preemption claim does not give rise to a fee award under Sec. 1988, they are entitled to fees on the basis of pendent Fourteenth Amendment claims pleaded in their original federal complaint. Plaintiffs rely upon Maher v. Gagne, 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980), for the proposition that a plaintiff who prevails on a claim not cognizable under Sec. 1983 may recover fees under Sec. 1988 on the basis of an unadjudicated constitutional claim that satisfies the "substantiality" test of Hagans v. Lavine, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974).
 
 
 34
 We reject this claim principally because plaintiffs have failed to provide us with any meaningful basis for evaluating their Fourteenth Amendment claims. All we have to go on in trying to understand and analyze the claims are the bare allegations in the complaint filed at the outset of the federal court action. Plaintiffs tell us nothing more about the claims other than that the complaint "specifically alleges claims under the Equal Protection Clause, Due Process Clause, and Indian Commerce Clause." Appellees' Answering Brief, at 50-51. We find these allegations, standing alone, far too meager to enable us to determine whether the claims meet the substantiality test of Hagans v. Lavine.[10]
 
 
 35
 The merit of plaintiffs' constitutional claims is rendered suspect not only by plaintiffs' failure to present this court with anything beyond a reference to the bare bones allegations of the complaint, but also by plaintiffs' failure to litigate these claims in the state courts. After the district court entered its Pullman abstention order, plaintiffs tendered their preemption claim to the state courts, but not the due process and equal protection claims.[11] Moreover, we agree with Amici Curiae that it is difficult to take these Fourteenth Amendment claims seriously "when the plaintiffs themselves did not think enough of the claims to even assert them in their brief to the U.S. Supreme Court."[12] Brief of Amici Curiae, at 8.
 
 
 36
 Even upon their return to the district court to seek attorney's fees, plaintiffs failed to put any flesh on the bare bones allegations of their complaint. Their motion for fees states merely that their "complaint also alleges violations of the Equal Protection and Due Process Clauses and the Indian Commerce Clause." Plaintiffs' Motion for Award of Attorneys' Fees Pursuant to 42 U.S.C. Sec. 1988, at 11. The district court awarded fees on the basis of the preemption claim without mentioning the Fourteenth Amendment claims. See Findings of Fact and Conclusions on the Plaintiffs' Motion for an Award of Attorneys' Fees Pursuant to 42 U.S.C. Sec. 1988.
 
 
 37
 This is not a case where a Sec. 1983 plaintiff seeks attorney's fees on the strength of constitutional claims which were pressed but not adjudicated because of "the longstanding judicial policy of avoiding unnecessary decision of important constitutional issues." Maher v. Gagne, 448 U.S. at 133, 100 S.Ct. at 2577. Rather, this is a case where the constitutional claims were never pressed beyond the original federal complaint until they were dusted off for use in seeking a fee award under Sec. 1988. For all practical purposes, plaintiffs abandoned their Fourteenth Amendment claims when, following the invocation of Pullman abstention by the district court, they failed to tender the claims to the state courts and the United States Supreme Court along with their preemption claim. In contrast, the pendent constitutional claims that provided the basis for a fee award in Maher were never abandoned and their substantiality was adjudicated by both the district court and the court of appeals. See Gagne v. Maher, 455 F.Supp. 1344, 1348 (D.Conn.), aff'd, 594 F.2d 336 (2nd Cir.1978), aff'd, 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980).
 
 
 38
 Finally, and perhaps most troublesome, is plaintiffs' failure to take advantage of their opportunity in this court for further exposition of their constitutional claims. They provide us with no meaningful analysis; the sole authority relied upon is Justice Stevens' dissent in White Mountain Apache Tribe v. Bracker, 448 U.S. at 158, 100 S.Ct. at 2591, a reliance we find to be misplaced. In the first place, plaintiffs mischaracterize Justice Stevens' dissent. They claim that he and Chief Justice Burger and Justice Rehnquist, who joined in the dissent, "felt that these state taxes did violate the due process and equal protection clauses". Appellees' Answering Brief, at 51 (emphasis added). All that Justice Stevens said was that Pinetop, as a private corporation doing business with an Indian Tribe, "may well have a right to be free from taxation as a matter of due process or equal protection," Bracker, 448 U.S. at 158, 100 S.Ct. at 2591 (Stevens, J., dissenting) (emphasis added), if the taxes burden a federal regulatory scheme and "there [is] no governmental interest on the State's part in imposing such a burden." Id. at 157, 100 S.Ct. at 2591. Indeed it would have been remarkable had Justice Stevens expressed the definitive opinion attributed to him by plaintiffs since preemption, not due process or equal protection, was the issue before the Court and the issue on which Justice Stevens disagreed with the majority. Justice Stevens' comments were clearly made solely for the purpose of contrast in the context of emphasizing that whatever valid grounds Pinetop might have had for challenging the state taxes, preemption was not one of them.
 
 
 39
 The second reason plaintiffs' reliance on Justice Stevens' dissent is misplaced is that the record leaves no room for doubt that Justice Stevens was not addressing the Fourteenth Amendment claims alleged in plaintiffs' federal complaint. Not only were those claims not before the Court in Bracker, which involved a review of the state court judgment, but also the dissent does not track the allegations of the federal complaint. Hence, whatever plaintiffs' constitutional theories might be, Justice Stevens was not addressing them. Justice Stevens speculated about conceivable constitutional claims that Pinetop as a private corporation might have, whereas the allegations in the complaint focus on the Tribe's status as a sovereign to enjoy treatment under Arizona tax laws on a par with the United States and the other states. Perhaps more importantly, Justice Stevens was speculating on possible constitutional implications of taxing vehicles used by Pinetop solely on private property, whereas the gravamen of plaintiffs' complaint is the state's failure to give plaintiffs beneficial treatment in apportioning the fuel use tax and motor carrier tax based upon travel on public and private roads within the state.[13] Moreover, while plaintiffs are correct in stating that Arizona's use fuel tax is levied "for the purpose of partially compensating the state for the use of its highways," Ariz.Rev.Stat.Ann. Sec. 28-1552 (1976), they fail to point out that the tax is expressly levied "in lieu of" direct fuel taxes. Ariz.Rev.Stat.Ann. Sec. 28-1554 (1976). As such, the use fuel tax is analytically indistinguishable from a direct fuel tax. We doubt that plaintiffs would seriously contend that Arizona can be forced to apportion direct fuel taxes collected at the pump.
 
 
 40
 In conclusion, we hold on the basis of the record before us that the Fourteenth Amendment claims fail to meet the substantiality test of Hagans v. Levine and have been asserted in this action at this late date "solely for the purpose of obtaining fees in [an action] where 'civil rights' of any kind are at best an afterthought." Maine v. Thiboutot, 448 U.S. 1, 24, 100 S.Ct. 2502, 2514, 65 L.Ed.2d 555 (1980) (Powell, J., dissenting).
 
 B
 
 41
 Finally, plaintiffs' failure to present their Fourteenth Amendment claims to the state courts provides an alternate ground for rejecting them as a basis for awarding fees under Sec. 1988. While we recognize that a federal plaintiff subject to Pullman abstention is not required to tender his federal claims to the state courts for adjudication, see England v. Louisiana State Board of Medical Examiners, 375 U.S. 411, 421, 84 S.Ct. 461, 467, 11 L.Ed.2d 440 (1963), we know of no authority suggesting that a federal plaintiff may tender some federal claims while reserving others arising out of the same nucleus of operative facts.[14] While England carves out an exception to principles of res judicata in permitting a federal plaintiff to tender his pendent state claims to the state courts and return to federal court on his reserved federal claims in the event he fails to get adequate relief in the state action, we see no basis in law or logic for stretching that exception to permit him to reserve some of his federal claims while tendering others to the state courts for adjudication. Because plaintiffs would plainly have been barred by res judicata from returning to federal court to litigate its due process and equal protection claims had they failed to obtain a favorable state court judgment, we hold that plaintiffs may not use those claims as a basis for returning to federal court to seek a fee award under Sec. 1988. For all practical purposes, plaintiffs abandoned their due process and equal protection claims when they failed to tender them to the state courts along with their preemption claim.
 
 
 42
 In sum, we hold that plaintiffs are not entitled to a fee award on the basis of the unadjudicated constitutional claims alleged in their federal complaint.
 
 IV
 
 43
 The state also appeals from the district court order granting a declaratory judgment and a permanent injunction. Plaintiffs contend that the injunction and declaratory judgment were appropriate because the district court's findings reflected a sufficient threat that the state would impose the impermissible taxes even after the Supreme Court barred it from doing so in White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980).
 
 
 44
 In the absence of a controversy "of sufficient immediacy and reality," Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941), a district court lacks jurisdiction to issue a declaratory judgment. Sellers v. Regents of the University of California, 432 F.2d 493, 499-500 (9th Cir.1970), cert. denied, 401 U.S. 981, 91 S.Ct. 1194, 28 L.Ed.2d 333 (1971). Here, there is no evidence that state officials intend to ignore the Supreme Court's decision in Bracker. The record in fact contains evidence to the contrary. After the Supreme Court's decision, the state filed an affidavit stating that it did not intend to impose any of the disputed taxes on Pinetop and the Tribe. We have no basis for presuming from this record that the Arizona officials will not honor a final state court judgment based upon a decision of the United States Supreme Court. We therefore hold that the district court erred in concluding that a controversy "of sufficient immediacy and reality" supported the issuance of a declaratory judgment against assessment of the taxes for the years covered by the Supreme Court's decision.
 
 
 45
 Plaintiffs further contend, however, that the district court properly entered a declaratory judgment on the merits covering the 1968-71 tax period, since assessments covering that period were never adjudicated by either the state courts or the Supreme Court. The state court tax refund action that ultimately reached the Supreme Court dealt only with taxes paid under protest after November 1971, and Pinetop and the Tribe argue that "each year is the origin of a new [tax] liability and a separate cause of action," Commissioner v. Sunnen, 333 U.S. 591, 598, 68 S.Ct. 715, 719, 92 L.Ed. 898 (1948). They nevertheless concede that any attempt by the state to impose taxes covering the 1968-71 period would be thwarted by the doctrine of collateral estoppel. Appellees' Answering Brief at 27. See Montana v. United States, 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979). We thus see no justification at this time for entering a declaratory judgment on the merits or granting injunctive relief covering the 1968-71 period.
 
 
 46
 REVERSED.
 
 FLETCHER, Circuit Judge, dissenting:
 
 47
 I respectfully dissent.
 
 
 48
 There are three separate and independent bases to support the district court's award of attorney's fees to the Tribe under 42 U.S.C. Sec. 1988 (1982). The Tribe has raised civil rights claims under 42 U.S.C. Sec. 1983 (1982) sufficient to support the section 1988 award based upon (1) Arizona's alleged violations of the federal laws regulating the harvest and sale of reservation timber, 25 U.S.C. Secs. 406-407, 466 (1982); (2) its alleged due process violations; and (3) its alleged equal protection violations by the state.
 
 
 49
 The Tribe raised these claims in its district court complaint;[1] they "aris[e] out of a 'common nucleus of operative fact' " along with the preemption claim upon which the Tribe prevailed in White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980); the Tribe has never abandoned them. H.R.Rep. No. 1558, 94th Cong., 2d Sess. 4 n. 7 (1976) (quoting United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966)); see Maher v. Gagne, 448 U.S. 122, 132 n. 15, 100 S.Ct. 2570, 2576 n. 15, 65 L.Ed.2d 653 (1980) (quoting the House Report); Southeast Legal Defense Group v. Adams, 657 F.2d 1118, 1124-25 (9th Cir.1981); see also Smith v. Robinson, 468 U.S. 992, 104 S.Ct. 3457, 3464, 82 L.Ed.2d 746 (1984). I find that the Tribe's claim based on the federal reservation-timber laws is meritorious, and I find that its due process and equal protection claims satisfy the "substantiality" test of Hagans v. Lavine, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974).[2] Moreover, I conclude that the Tribe has the capacity to bring a section 1983 action in federal court to vindicate these claims.[3] Therefore, based upon the legislative history of section 1988 and the Supreme Court's decision in Maher v. Gagne, 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980), I conclude that each of the Tribe's section 1983 claims is sufficient to justify the district court's award of attorney's fees. See H.R.Rep. No. 1558, supra, at 4 n. 7; Maher, 448 U.S. at 132 n. 15, 100 S.Ct. at 2576 n. 15 (quoting House Report); Jensen v. Stangel, 790 F.2d 721, 723 (9th Cir.1986) (concluding that Congress intended "a liberal construction of section 1988 to achieve the purpose of encouraging compliance with and enforcement of the civil rights laws").
 
 
 50
 A. The Tribe's Failure to Litigate Its Section 1983 Claims in Bracker
 
 
 51
 The majority contends that because the Tribe failed to litigate its section 1983 claims before the Arizona state courts and the United States Supreme Court in the Bracker case after the district court entered its Pullman abstention order, the Tribe effectively "abandoned" those claims for purposes of this case. Such a conclusion is contrary to the Supreme Court's decision in England v. Louisiana State Board of Medical Examiners, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1963), and to our court's decision in Tovar v. Billmeyer, 609 F.2d 1291 (9th Cir.1979).
 
 
 52
 In England, the Supreme Court provided that in cases where a federal district court enters an abstention order, "[i]f a party freely and without reservation submits his federal claims for decision by the state courts, litigates them there, and has them decided there, then ... he has elected to forgo his right to return to the District Court." England, 375 U.S. at 419, 84 S.Ct. at 467 (emphasis added). In the case before us, after the district court entered its abstention order, the Tribe did not submit its section 1983 claims for decision to the Arizona state courts or the United States Supreme Court, did not litigate them in those courts, and did not have them decided there. See White Mountain Apache Tribe v. Bracker, 120 Ariz. 282, 585 P.2d 891, 893-900 (Ct.App.1978), rev'd, 448 U.S. 126, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980); Bracker, 448 U.S. at 138, 100 S.Ct. at 2580. The Tribe preserved its section 1983 claims, and cannot be found to have abandoned them.
 
 
 53
 Our court stated in Tovar that "[a] free and unreserved submission to the state court of all federal claims for complete and final resolution is necessary to bar return to the federal court." Tovar, 609 F.2d at 1294 (emphasis added). The majority itself concedes that the Tribe never freely submitted its section 1983 claims for resolution in the Bracker case.[4] Thus, these claims were properly before the district court when it awarded section 1988 attorney's fees.
 
 
 54
 B. The Tribe's Section 1983 Claim Based Upon the Indian Reservation Timber Laws
 
 
 55
 The majority maintains that even if the Tribe's claims were properly before the district court, violations of the federal laws regulating the harvest and sale of reservation timber, such as those alleged by the Tribe in this case, cannot give rise to a civil rights action under section 1983. I disagree. Section 1983 provides a cause of action for state officials' violations of federal statutes whenever (1) the statutes create "enforceable rights," and (2) Congress did not, in the statutes themselves, foreclose private enforcement of those rights through a section 1983 action. Middlesex County Sewerage Authority v. National Sea Clammers Association, 453 U.S. 1, 18, 101 S.Ct. 2615, 2625, 69 L.Ed.2d 435 (1981); accord Pennhurst State School and Hospital v. Halderman, 451 U.S. 1, 28, 101 S.Ct. 1531, 1545, 67 L.Ed.2d 694 (1981); Almond Hill School v. United States Department of Agriculture, 768 F.2d 1030, 1035 (9th Cir.1985); Keaukaha-Panaewa Community Association v. Hawaii Homes Commission, 739 F.2d 1467, 1470 (9th Cir.1984). I conclude that both these requirements are satisfied in respect to sections 406, 407, and 466, and that the Tribe is therefore entitled to vindicate its rights under these provisions in a section 1983 action. I further conclude, based upon the Supreme Court's opinion in Bracker, that the Tribe's section 1983 claim under these provisions is meritorious.
 
 
 56
 As the majority acknowledges, sections 406, 407, and 466 require the Secretary of the Interior to manage tribal timber resources based "upon a consideration of the needs and best interests" of the tribe, and to ensure that proceeds from any timber sales be paid to the tribe "or disposed of for [its] benefit," subject only to limited deductions for "administrative expenses" incurred by the federal government. 25 U.S.C. Secs. 406(a), 413; 25 C.F.R. Sec. 163.18 (1985); see United States v. Mitchell, 463 U.S. 206, 222 n. 23, 224, 103 S.Ct. 2961, 2971 n. 23, 2971, 77 L.Ed.2d 580 (1983); Bracker, 448 U.S. at 145-47 & nn. 12-13, 149, 100 S.Ct. at 2584-85 & nn. 12-13, 2586 (citation omitted); Short v. United States, 719 F.2d 1133, 1135-36 (Fed.Cir.1983), cert. denied, 467 U.S. 1256, 104 S.Ct. 3545, 82 L.Ed.2d 849 (1984). The purpose of these provisions is to ensure that tribes receive " 'the benefit of whatever profit [the forest] is capable of yielding,' " Bracker, 448 U.S. at 147, 149, 100 S.Ct. at 2585, 2586 (citation omitted); accord Mitchell, 463 U.S. at 221-22, 103 S.Ct. at 2970-71, and to provide that tribal timberlands be managed " 'so as to obtain the greatest revenue for ... Indians consistent with a proper protection and improvement of the forests.' " Mitchell, 463 U.S. at 224, 103 S.Ct. at 2972 (quoting U.S. Office of Indian Affairs, Regulations and Instructions for Officers in Charge of Forests on Indian Reservations 4 (1911)). The Supreme Court recently held, based largely upon its decision in Bracker, that these provisions establish a trust relationship between the federal government and tribes with timberlands on their reservations, and that they establish a "substantive right enforceable [by tribes] against the United States for money damages" under the Tucker Act if the federal government breaches its fiduciary duties.[5] Mitchell, 463 U.S. at 216-18, 224, 226, 103 S.Ct. at 2967-69, 2971, 2972; accord Short, 719 F.2d at 1134-35 (interpreting Mitchell to cover both allotted and unallotted lands).
 
 
 57
 Our court recently held that a federal act establishing a land trust for the betterment of native Hawaiians created rights enforceable by those individuals under section 1983 against parties who interfere with or deprive them of their rights or benefits under the trust.[6] Keaukaha-Panaewa, 739 F.2d at 1471-72. Similarly, the Eighth Circuit has held that interference by state or local officials with the rights of Indians who place their lands in trust with the federal government under 25 U.S.C. Sec. 465 (1982)[7] provides a basis for those Indians to bring section 1983 claims. See Chase v. McMasters, 573 F.2d 1011, 1017 (8th Cir.), cert. denied, 439 U.S. 965, 99 S.Ct. 453, 58 L.Ed.2d 423 (1978). Based upon these decisions and the Supreme Court's analysis in Mitchell, I conclude that by establishing a trust relationship between Indian tribes and the federal government, sections 406, 407, and 466 create rights that tribes who are deprived of their trust benefits or whose trust relationships are disrupted can enforce under 1983.[8]
 
 
 58
 I also conclude that Congress did not intend to foreclose private enforcement under section 1983 of the rights it created for Indian tribes in sections 406, 407 and 466. We have held that "there is a presumption that a federal statute creating enforceable rights may be enforced in a section 1983 action," and that the burden is on the "governmental defendant [to] show that Congress intended the federal statute in question to provide the exclusive remedy." Keaukaha-Panaewa, 739 F.2d at 1470-71 (emphasis added and citations omitted); accord Almond Hill School, 768 F.2d at 1035. The text of sections 406, 407 and 466 does not suggest that Congress intended to preclude a section 1983 remedy. The three provisions do not include a "comprehensive enforcement scheme" with a " 'balance, completeness and structural integrity' that would suggest remedial exclusivity," Middlesex, 453 U.S. at 20, 101 S.Ct. at 2626; Almond Hill School, 768 F.2d at 1035-36 (citations omitted); Keaukaha-Panaewa, 739 F.2d at 1471; Department of Education, State of Hawaii v. Katherine D., 727 F.2d 809, 820 (9th Cir.1983), cert. denied, --- U.S. ----, 105 S.Ct. 2360, 86 L.Ed.2d 260 (1985), nor do they provide remedies that are inconsistent with those available under section 1983. See Almond Hill School, 768 F.2d at 1035-36; Keaukaha-Panaewa, 739 F.2d at 1471; Katherine D., 727 F.2d at 820.
 
 
 59
 On the contrary, these provisions do not explicitly mention any remedies at all--the damages remedy against the federal government for breach of fiduciary duty that the Supreme Court recognized in Mitchell was based upon inferences the Court drew from the provisions' structure and legislative history. See 25 U.S.C. Secs. 406, 407, 466; Mitchell, 463 U.S. at 218, 224-27, 103 S.Ct. at 2969, 2971-73. Even assuming that Congress specifically contemplated a Tucker Act remedy when it adopted the three provisions, we have held that a federal act providing only a single, limited remedy "does not contain a sufficiently comprehensive enforcement scheme to foreclose a section 1983 remedy." Keaukaha-Panaewa, 739 F.2d at 1471; see also Almond Hill School, 768 F.2d at 1036-37; cf. Maine v. Thiboutot, 448 U.S. 1, 66, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980) (authorizing section 1983 action to enforce Social Security Act where only a single, limited remedy was expressly provided under the Act). Moreover, as the present case illustrates, limiting Indian tribes whose reservations contain timberlands to the sole remedy recognized in Mitchell would deny them any redress whatsoever against state officials who interfere with the trust relationship created by sections 406, 407, and 466 and who attempt to deny tribes the benefits to which these provisions entitle them. I therefore conclude, based upon the lack of any explicitly delineated remedies in sections 406, 407, and 466 and based upon the legislative history and background of the three provisions, that Congress did not intend to foreclose private enforcement of these provisions under section 1983.
 
 
 60
 Since both conditions required by the Supreme Court for establishing the availability of a section 1983 cause of action are satisfied, I conclude that the Tribe was entitled to enforce its section 406, 407, and 466 rights against the defendants in a section 1983 action. See Middlesex, 453 U.S. at 19, 101 S.Ct. at 2625. Moreover, in light of the Supreme Court's decision in Bracker, I conclude that the Tribe's section 1983 claims based upon these three provisions are meritorious. The Court stated in Bracker that "the [challenged Arizona] taxes would threaten the overriding federal objective of guaranteeing Indians that they will 'receive ... the benefit of whatever profit [the forest] is capable of yielding.' " Bracker, 448 U.S. at 149, 100 S.Ct. at 2586 (citations omitted). It stated that "[t]he imposition of the taxes at issue would undermine" the "policy of assuring that the profits derived from timber sales will inure to the benefit of the Tribe, subject only to administrative expenses incurred by the Federal Government." Id. (citations omitted). Thus, the Supreme Court found that the challenged Arizona taxes deprive the Tribe of the central benefit guaranteed to it in its trust relationship with the federal government under sections 406, 407, and 466. See Mitchell, 463 U.S. at 221-24, 103 S.Ct. at 2970-72. I therefore conclude that the tribe would prevail on its section 1983 claim based on those three provisions.
 
 
 61
 C. The Tribe's Section 1983 Claims Based on Due Process and Equal Protection
 
 
 62
 The majority asserts that the Tribe's due process and equal protection claims are frivolous, "difficult to take ... seriously," and so "insubstantial" that they will not support an attorney's fees award under section 1988. It concludes that even if these claims were properly before the district court, they do not satisfy the "substantiality test" of Hagans v. Lavine, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974).[9] I disagree. The Supreme Court provided in Hagans thatclaims are constitutionally insubstantial only if ... prior decisions inescapably render the claims frivolous; previous decisions that merely render claims of doubtful or questionable merit do not render them insubstantial.... A claim is insubstantial only if " 'its unsoundness so clearly results from ... previous decisions ... as to foreclose the subject and leave no room for the inference that the questions sought to be raised can be the subject of controversy.' "
 
 
 63
 Hagans, 415 U.S. at 537-38, 94 S.Ct. at 1379 (quoting Goosby v. Osser, 409 U.S. 512, 518, 93 S.Ct. 854, 858, 35 L.Ed.2d 36 (1973)) (citations omitted and emphasis added).[10] I conclude that the Tribe's due process and equal protection claims are not insubstantial or frivolous under Hagans' definition, and therefore support the district court's award of attorney's fees under section 1988. See Maher, 448 U.S. at 132 n. 15, 100 S.Ct. at 2576 n. 15.
 
 
 64
 The dissenting opinion in Bracker, 448 U.S. at 153, 100 S.Ct. at 2588 (Stevens, J., dissenting), subscribed to by three Justices, concluded that the Tribe and "Pinetop may well have a right to be free from [the challenged Arizona] taxation as a matter of due process or equal protection." Id. at 158 & n. 7, 100 S.Ct. at 2591 & n. 7.[11] It seems unlikely that one-third of the Supreme Court would make such a statement if, as the majority suggests, previous " 'decisions ... leave no room for the inference that the questions [involved can] be the subject of controversy.' " Hagans, 415 U.S. at 538, 94 S.Ct. at 1379 (citations omitted).
 
 
 65
 The majority opinion in Bracker demonstrates that all the necessary elements are present for the Tribe, acting in its corporate capacity,[12] to raise viable due process and equal protection challenges to Arizona's vehicle taxes. First, the Bracker majority noted that "it is undisputed that the economic burden of the asserted taxes will ultimately fall on the Tribe." Bracker, 448 U.S. at 151, 100 S.Ct. at 2587. Thus, the Tribe has standing to challenge the Arizona taxes and has alleged that imposition of these taxes deprived it of property under the fourteenth amendment. See Warth v. Seldin, 422 U.S. 490, 498-99, 95 S.Ct. 2197, 2204-05, 45 L.Ed.2d 343 (1975); Fuentes v. Shevin, 407 U.S. 67, 86, 92 S.Ct. 1983, 1997, 32 L.Ed.2d 556 (1972).
 
 
 66
 Second, Arizona conceded during oral argument in Bracker that its taxes do not apply to the use of vehicles on private roads and property in the state. Bracker, 448 U.S. at 154-55 & nn. 3-4, 100 S.Ct. at 2589-90 & nn. 3-4 (Stevens, J., dissenting) (quoting Supreme Court transcript); see also id. at 148 n. 14, 100 S.Ct. at 2586 n. 14. Yet the Bracker majority found that Arizona had taxed the use of vehicles by the Tribe and Pinetop in operations "conducted solely on the Fort Apache Reservation" and on roads that were "built, maintained, and policed exclusively by the Federal Government, the Tribe, and its contractors." Id. at 150, 100 S.Ct. at 2587. Thus, Arizona treated the Tribe differently from other, similarly situated parties in the state who operate vehicles on non-state maintained roads and private property.[13]
 
 
 67
 Finally, the Bracker majority reiterated throughout its opinion that the State of Arizona is "unable to identify any regulatory function or service performed by the State that would justify the assessment of taxes for activities on Bureau [of Indian Affairs] and tribal roads within the reservation." Id. at 148-49, 150-51, 100 S.Ct. at 2586, 2587. This suggests that there may well be no rational basis for or legitimate purpose furthered by Arizona's disparate treatment of the Tribe and other parties. See Williams v. Vermont, 472 U.S. 14, 105 S.Ct. 2465, 2472, 86 L.Ed.2d 11 (1985); Metropolitan Life Insurance Co. v. Ward, 470 U.S. 869, 105 S.Ct. 1676, 1683, 84 L.Ed.2d 751 (1985). Thus, the Bracker majority concluded that imposition of the challenged Arizona taxes deprived the Tribe of property, that in imposing these taxes, Arizona treated the Tribe differently from other, similarly situated entities, and that Arizona has failed to identify any rational basis for doing so. I conclude, as a result, that the due process and equal protection claims raised by the Tribe are not frivolous or foreclosed by prior decisions, and therefore support the district court's award of section 1988 attorney's fees.[14] See, e.g., Williams, 105 S.Ct. at 1679-84.D. The Tribe's Capacity to Bring A Section 1983 Action In Federal Court
 
 
 68
 Since the Tribe has asserted viable section 1983 claims based upon the Indian reservation timber laws and the due process and equal protection clauses, it is entitled to recover section 1988 attorney's fees if (1) it has the capacity to bring a section 1983 action based on those claims; and (2) such an action is not barred in the federal courts by the Tax Anti-Injunction Act, 28 U.S.C. Sec. 1341 (1982).[15] Although not every action by an Indian tribe challenging the imposition of state taxes will satisfy these two requirements, I conclude, based on the circumstances of this case and the capacity in which the Tribe initiated this litigation, that the present action satisfies both requirements, and that the Tribe is entitled to recover section 1988 attorney's fees.[16]
 
 
 69
 The Tribe brought this action in its capacity as an incorporated business entity under section 17 of the Indian Reorganization Act (IRA), 25 U.S.C. Sec. 477 (1982):[17] its standing to challenge Arizona's taxes is based on the tax burden it incurred while operating in a proprietary capacity. See Moe v. Confederated Salish and Kootenai Tribes, 425 U.S. 463, 468 n. 7, 96 S.Ct. 1634, 1639 n. 7, 48 L.Ed.2d 96 (1976) (focussing on basis of tribe's standing to challenge particular state taxes); see also Assiniboine & Sioux Tribes, 568 F.Supp. at 276-77. The Tribe's first amended complaint states that "[t]he forestry operations of the tribe are run by the Fort Apache Timber Company [FATCO], a wholly owned business of the White Mountain Apache Tribe.... The lumbering operation is the Tribe's principal industrial activity and provides a substantial portion of the revenue and employment for the tribe and its members." FATCO has contractual agreements with six logging companies, including Pinetop, under which the companies fell trees, cut them to specified size, and transport them to FATCO's sawmill for a contractually-specified fee. When Arizona assessed taxes on Pinetop for its use of roads within the White Mountain Apache Reservation, the Tribe had to agree to reimburse Pinetop for any tax liability it incurred, in order to avoid losing Pinetop's services. Bracker, 448 U.S. at 139-40 & n. 7, 100 S.Ct. at 2581-82 & n. 7. The Tribe's interest in challenging the Arizona taxes arises, therefore, not out of its capacity as a sovereign, but out of its involvement as a joint venturer with private companies in logging operations.[18]
 
 
 70
 Since the Tribe is acting as a business corporation, it qualifies as a "citizen or other person" entitled to bring an action under section 1983 to enforce its rights under the Indian timber laws and the due process and equal protection clauses. Our court and other courts have held that private corporations qualify as "citizens" or "other persons" entitled to bring section 1983 actions. See California Diversified Promotions, Inc. v. Musick, 505 F.2d 278, 283 (9th Cir.1974) (corporations can bring section 1983 actions to vindicate their due process rights); Des Vergnes v. Seekonk Water District, 601 F.2d 9, 16 (1st Cir.1979) (corporations are "persons" under section 1983 entitled to bring actions to vindicate their equal protection rights); Advocates for the Arts v. Thomson, 532 F.2d 792, 794 (1st Cir.), cert. denied, 429 U.S. 894, 97 S.Ct. 254, 50 L.Ed.2d 177 (1976); see also Metropolitan Life Insurance, 105 S.Ct. at 1683 n. 9 ("It is well established that a corporation is a "person" within the meaning of the Fourteenth Amendment."); Grosjean v. American Press Co., 297 U.S. 233, 244, 56 S.Ct. 444, 446, 80 L.Ed. 660 (1936) (corporation is a "person" under the equal protection and due process clauses). In enacting the IRA, Congress intended to enable tribal business enterprises "to enter the white world on a footing of equal competition." 78 Cong.Rec. 11732 (1934); accord Mescalero Apache Tribe, 411 U.S. at 157, 93 S.Ct. at 1275. It presumably did not intend them to be saddled with any legal disabilities greater than those of other private corporations solely because they are affiliated with sovereign tribal governments, but expected instead that private and tribal corporations would be treated identically.[19] Therefore, since a private corporation would be entitled to challenge Arizona's vehicle taxes in a section 1983 action, the Tribe acting as a business corporation is entitled to bring such an action as well.
 
 
 71
 I also conclude that the Tribe's action is not barred by section 1341, because it qualifies for the "Indian tribes" exception to that provision. The Supreme Court ruled in Moe that if an action challenging the imposition of state taxes can be brought under the "Indian tribes" jurisdictional provision, 28 U.S.C. Sec. 1362 (1982), it automatically qualifies for the "Indian tribes" exception to section 1341. See Moe, 425 U.S. at 472-75, 96 S.Ct. at 1640-42. Based upon the plain language and legislative history of section 1362, and our prior cases interpreting that provision, I conclude that the Tribe is entitled to bring the present action under section 1362, and therefore is not barred by section 1341 from bringing it in federal court.
 
 
 72
 The plain language of section 1362 authorizes actions "brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior":[20] it does not distinguish between the "governmental" tribe provided for in IRA section 16 and the "incorporated tribe" provided for in section 17. 28 U.S.C. Sec. 1362 (emphasis added); 25 U.S.C. Secs. 476-477. Moreover, nothing in section 1362's legislative history indicates that it was intended to apply only to tribes acting in a sovereign or governmental capacity. See H.R.Rep. No. 2040, 89th Cong., 2d Sess., reprinted in 1966 U.S.Code Cong. & Ad.News 3145, 3146-47. When Congress passed section 1362 in 1966, it was fully aware that Indian tribes can act in both sovereign and proprietary capacities. Therefore, its failure to limit explicitly the scope of section 1362 to actions brought by tribes in their governmental capacity suggests that it intended the provision to encompass actions brought by tribes in their corporate capacity as well. Furthermore, this court has held that "statutes passed for the benefit of Indian tribes, such as section 1362, are to be liberally construed, with doubtful expressions being resolved in the Indians' favor." Gila River Indian Community v. Henningson, Durham & Richardson, 626 F.2d 708, 712 (9th Cir.1980) (citations omitted and emphasis added), cert. denied, 451 U.S. 911, 101 S.Ct. 1983, 68 L.Ed.2d 301 (1981).
 
 
 73
 This circuit's decision in Navajo Tribal Utility Authority v. Arizona Department of Revenue, 608 F.2d 1228 (9th Cir.1979), also indicates that the Tribe's action is not barred under section 1341. In that case, we held that a utility company that was loosely affiliated with the Navajo Tribe could not bring an action as an "Indian tribe or band" under section 1362, since the utility company was semi-autonomous, three of its seven directors were not members of the Tribe, and the Tribe itself was "not a party" to the action. Id. at 1231-32. Although we held that Congress had not intended section 1362 to "provide access to federal courts for subordinate, semi-autonomous entities of Indian tribes and bands," we concluded that:
 
 
 74
 If the leadership of a tribe or band decides that litigation is necessary to protect the rights of the tribe or band, then section 1362 will provide federal court access to the tribe or band when the other jurisdictional requirements of that section are also met.
 
 
 75
 Id. at 1232 (emphasis added). We also indicated that "[t]o the extent that [the utility's] interests are identified with the Tribe's, the Tribe itself will be able to protect those interests, should its leadership decide to do so." Id. at 1233 (citing Mescalero Apache Tribe, 411 U.S. at 157 n. 13, 93 S.Ct. at 1275 n. 13) (emphasis in original).[21]
 
 
 76
 In the present action, the Tribe has followed the precise guidelines suggested in Navajo Tribal Utility. The Tribe has brought the action in its own name on behalf of a tribal enterprise that it totally controls. There is nothing in the record to suggest that FATCO is semi-autonomous, or that its interests diverge from the Tribe's in any way. Thus, the Tribe's action can be brought in federal court under section 1362 and qualifies under the "Indian tribes" exception to section 1341.
 
 
 77
 Since I conclude that the Tribe was entitled to bring its present section 1983 action in federal court, that its claims based on the Indian reservation timber laws are meritorious, and that its due process and equal protection claims are not "frivolous" under the definition provided in Hagans v. Lavine, I would affirm the district court's award of attorney's fees to the Tribe.
 
 
 
 *
 Following the death of Senior Circuit Judge Walter Ely, Judge Fletcher was selected to replace him on the panel
 
 
 **
 Honorable James M. Burns, United States District Judge for the District of Oregon, sitting by designation
 
 
 [1]
 42 U.S.C. Sec. 1983 states:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 
 
 [2]
 42 U.S.C. Sec. 1988, the Civil Rights Attorney's Fees Awards Act of 1976, provides:
 In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.
 
 
 [3]
 The Anti-Injunction Act, 28 U.S.C. Sec. 1341 (1982), denies federal courts jurisdiction to enjoin state taxes. Federal jurisdiction in this case, however, rests on 28 U.S.C. Sec. 1362, as interpreted in Moe v. Confederated Salish & Kootenai Tribes, 425 U.S. 463, 475, 96 S.Ct. 1634, 1642, 48 L.Ed.2d 96 (1976), which creates an exception to the Anti-Injunction Act in actions by Indian tribes to enjoin state taxes
 
 
 [4]
 Section 1343(3) is the statutory provision conferring jurisdiction on federal district courts to hear actions commenced "[t]o redress the deprivation, under color of state law ... of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights." 28 U.S.C. Sec. 1343(3)
 
 
 [5]
 At the time Connor was decided, Sec. 1983 was codified as 8 U.S.C. Sec. 43 and Sec. 1343(3) was codified as 28 U.S.C. Sec. 41(14)
 
 
 [6]
 See Kennecott Corp. v. Smith, 637 F.2d 181 (3d Cir.1980); Confederated Salish and Kootenai Tribes v. Moe, 392 F.Supp. 1297 (D.Mont.1974), aff'd on other grounds, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976); Confederated Salish and Kootenai Tribes v. Montana, 392 F.Supp. 1325 (D.Mont.1975)
 
 
 [7]
 We emphasize that we are not dealing with a case where state action is in actual conflict with the explicit provisions of federal law. Therefore, we need not reach the question whether a Supremacy Clause claim might give rise to a Sec. 1983 action where preemption was based on such actual conflict. Here we deal only with preemption based on federal occupation of the field and conflict between state law and federal goals and policies. For a discussion of the various branches of preemption doctrine, see generally L. Tribe, American Constitutional Law 376-89 (1978)
 
 
 [8]
 The dissent argues that the violation of federal regulations governing the harvest of tribal timber would give rise to a Sec. 1983 action because those statutes were designed to benefit the Tribe. Dissent at 1219-1222. While we disagree that these regulations intended to create rights enforceable under Sec. 1983, it is perhaps more important that the Tribe has never contended--and no court has ever found--that these statutes were ever violated. In our view, therefore, the Tribe fails to clear the first hurdle presented by the Thiboutot-Pennhurst-Sea Clammers line of cases. Unlike the situation in Thiboutot, or in Boatowners, no federal statute or regulation was violated by the Arizona tax on plaintiffs' logging operations. Rather we have a case in which pervasive federal regulation precludes any state regulation. See Bracker, 448 U.S. at 148, 100 S.Ct. at 2586. Section 1983, as interpreted in Thiboutot and its progeny, enforces federal statutory rights only against direct violations of the federal statute in question. See Middlesex County Sewerage Authority v. National Sea Clammers Ass'n, 453 U.S. 1, 19, 101 S.Ct. 2615, 2625, 69 L.Ed.2d 435 (1981) (Thiboutot recognized Sec. 1983 action on behalf of "a private party claiming that a federal statute has been violated under color of state law."); Pennhurst, 451 U.S. at 28, 101 S.Ct. at 1545 (remanding for a determination of whether the state officials violated the DDA)
 
 
 [9]
 Indeed, the Tribe's right to invoke the power of federal courts to enjoin Arizona from taxing Pinetop's logging operations rests on considerations of sovereignty, not individual rights. Any plaintiff other than an Indian tribe would be barred by the Tax Injunction Act from bringing a Sec. 1983 action to enjoin state taxation and hence from obtaining attorney's fees under Sec. 1988. While we do not address the question whether the Tribe may bring a Sec. 1983 action to enjoin state taxation, we do note the hoops that the dissent is forced to jump through to make this determination. See Dissent, at 1226-27 & n. 16. The dissent recognizes that a tribe cannot avoid the bar of the Tax Injunction Act in an action based on the rights of individual tribe members. Id. at 1226 n. 15. The dissent also acknowledges that it is doubtful whether a tribe "qua sovereign" would qualify as a "citizen of the United States or other person" entitled to sue under Sec. 1983. Id. The dissent purports to overcome these hurdles by opining that here the Tribe may sue under Sec. 1983 because it is acting in this case as a "incorporated business entity". Id. at 1227. Conventional business entities--such as Pinetop--would, of course, be barred by the Tax Injunction Act from bringing this action in federal court
 
 
 [10]
 Plaintiffs pleaded their equal protection claim in the district court as follows:
 The denial of equal protection results from the state's attempt to impose unapportioned taxes on the plaintiffs' logging operations occurring partly over roads maintained by the State of Arizona, but not on other operations that occur in part over state roads and part over non-state roads. There is no attempt to impose similar unapportioned taxes on carriers that operate partly in the State of Arizona and partly within some other state, and A.R.S. Sec. 40-641 expressly exempts "receipts from property transported under a star route contract of the federal government."
 There is no legal basis for the taxation; the taxation is arbitrary and discriminatory, lacking any rational basis. First Amended Complaint, p XXIII.
 Plaintiffs' due process claim was pleaded in its entirety as follows:
 The unapportioned application of these taxes to the plaintiffs' operations constitutes a taking in contravention of the Fourteenth Amendment of the United States Constitution as due process is denied. First Amended Complaint, p XXIV.
 
 
 [11]
 Although we do not have before us the record in the state court action, we infer that plaintiffs did not tender the Fourteenth Amendment claims to the state courts because plaintiffs have not disputed the state's contention that the plaintiffs "never argued in the state courts nor in the Supreme Court any constitutional violation." Reply Brief of Appellant, at 16. The record is clear that the claims are not mentioned in the published opinion of the Arizona Court of Appeals, White Mountain Apache Tribe v. Bracker, 120 Ariz. 282, 585 P.2d 891 (Ct.App.1978), rev'd, 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980), and were not raised in the United States Supreme Court. See note 12, infra
 
 
 [12]
 Plaintiffs' response to this argument by Amici is grossly misleading. Plaintiffs say that their failure to raise the Fourteenth Amendment claims before the Supreme Court "proves only that the Supreme Court is the master of its docket, [because the Court] granted certiorari only on the federal preemption issue, and the plaintiffs briefed nothing more." Appellees' Answering Brief at 51-52 (emphasis in original). The clear implication of this explanation is that plaintiffs raised the due process and equal protection claims in their Petition for Certiorari, but that the Court's order granting certiorari excluded those claims from consideration. Upon recalling and reviewing the Petition for Certiorari and the various briefs in White Mountain Apache Tribe v. Bracker, we learned what plaintiffs failed to tell us: They did not raise any Fourteenth Amendment claims in their Petition for Certiorari. Moreover, neither due process nor equal protection was mentioned in any of the various briefs filed in the case. Thus the true explanation for plaintiffs' failure to argue the Fourteenth Amendment claims to the Supreme Court is not that the Court is the master of its docket, but that plaintiffs never asked the Court to consider those claims
 
 
 [13]
 The dissent overlooks this crucial distinction in concluding that the plaintiffs were treated differently from other similarly situated parties in the state because taxes were being imposed for vehicles used solely on private property. Dissent, at 1224. In fact, the vehicles involved were operated on both public and private roads. See Bracker, 448 U.S. at 154 & n. 3, 100 S.Ct. at 2589 & n. 3
 In pleading their Fourteenth Amendment claim, plaintiffs' allege that the Tribe and its partner Pinetop have a constitutional entitlement to be treated in the same manner as interstate truckers whose state fuel use taxes are apportioned to capture only that portion of fuel use actually attributable to travel on roads within the state. See note 10, supra. Thus, the Tribe contended that, for the purpose of the Arizona tax, tribal roads should be treated as though they were in a separate state. Arizona refused to do this, asserting that Pinetop's activities took place solely within Arizona and that Pinetop should be taxed in the same manner as are all other commercial entities that use vehicles on both public and private roads in Arizona. Thus, contrary to the dissent's assertions, plaintiffs were not "singled out" for disparate treatment and taxed "differently from other landowners in the State." Dissent, at 1223 n. 10. Rather, they were taxed in exactly the same fashion as all others who use both public and private roads within Arizona--without apportionment. The only exception was the United States government, which was expressly exempted from the taxes. Ariz.Rev.Stat. Sec. 40-641 (1982).
 
 
 [14]
 The state argues that the district court lacked jurisdiction over the issue of attorney's fees when plaintiffs presented their federal claims to the Arizona courts. The state relies on England v. Louisiana State Board of Medical Examiners, 375 U.S. 411, 421, 84 S.Ct. 461, 467, 11 L.Ed.2d 440, where the Court determined that federal claims presented to the state court under a Pullman order may not be relitigated in federal court. Id. at 419, 84 S.Ct. at 466. We believe, however, that England does not present a jurisdictional bar to these claims, but rather announces only a rule of res judicata. Thus, the district court was not deprived of subject matter jurisdiction to hear the fees claim. Because we hold that plaintiffs do not have a Sec. 1983 claim to support an award of fees under Sec. 1988, we need not decide whether the Tribe may return to federal court on their discrete claim for attorney's fees after submitting their preemption claims to the state courts. Nor need we decide whether the Tribe lacks standing to seek a fee award under Sec. 1988 because it is not a "citizen" or "person" within the meaning of Sec. 1983
 
 
 [1]
 The majority maintains that "[t]he Tribe has never contended and no court has ever found that the[ ] statutes [regulating Indian reservation-timber] were ever violated." Majority Opinion at 1212 n. 8. However, the Tribe explicitly alleges in its complaint that "[t]he taxes and regulations attempted to be imposed by the State of Arizona are in direct contravention of the stated objectives of [the] Federal regulations" that were promulgated by the Secretary in order to fulfill his trust responsibilities under the reservation-timber laws. First Amended Complaint, Sec. XXVII (emphasis added). Moreover, the Supreme Court expressly stated in Bracker that "the [Arizona] taxes would threaten the overriding federal objective " and "would undermine th[e] policy " for which the reservation-timber laws were enacted. Bracker, 448 U.S. at 149, 100 S.Ct. at 2586 (emphasis added). Thus, the Tribe has alleged, and the Supreme Court has strongly suggested, that the imposition of the challenged Arizona taxes "violat[ed] ... rights created by federal statutes," as would be required to establish a section 1983 claim based on sections 406, 407, and 466 of the reservation-timber laws. Middlesex County Sewerage Authority v. National Sea Clammers Association, 453 U.S. 1, 19, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981) (emphasis added)
 
 
 [2]
 In determining whether the Tribe's section 1983 claims support an award of section 1988 attorney's fees, the standards for evaluating claims based on alleged violations of federal statutes and claims based on alleged constitutional violations appear to be different. The legislative history of section 1988 provides that:
 [when] a plaintiff joins a claim under one of the statutes enumerated in [section 1988, for which attorney's fees are available,] with a claim that does not allow attorney fees, that plaintiff, if it prevails on the non-fee claim, is entitled to a determination on the other claim for the purpose of awarding counsel fees. In some instances, however, the claim with fees may involve a constitutional question which the courts are reluctant to resolve if the non-constitutional claim is dispositive. In such cases, if the claim for which fees may be awarded meets the "substantiality" test [enunciated in] Hagans v. Lavine [, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974),] attorney's fees may be allowed even though the court declines to enter judgment for the plaintiff on that claim, so long as the plaintiff prevails on the non-fee claim arising out of a "common nucleus of operative fact."
 H.R.Rep. No. 1558, 94th Cong., 2d Sess. 4 n. 7 (1976) (citations omitted and emphasis added), quoted in Maher v. Gagne, 448 U.S. 122, 132 n. 15, 100 S.Ct. 2570, 2576 n. 15, 65 L.Ed.2d 653 (1980).
 This language appears to suggest that for the Tribe to recover section 1988 attorney's fees based on its claims relating to the reservation-timber statutes, those claims must be determined to be meritorious, whereas to recover based on its constitutional due process and equal protection claims, those claims merely must be found to be "substantial," or non-frivolous. See Hagans, 415 U.S. at 537-38, 94 S.Ct. at 1379-80 (defining "substantiality" of claims); see also Section C, infra. Because I conclude that the Tribe's claim based on the reservation-timber statutes is meritorious, I need not decide whether a different standard applies in awarding fees for the Tribe's two different types of section 1983 claims. I find that any of the Tribe's three section 1983 claims independently supports the district court's award of attorney's fees.
 
 
 [3]
 Because I reject the majority's conclusions that the Tribe's section 1983 claims are procedurally barred and are either non-meritorious or frivolous, I am required to address two issues that the majority is not required to resolve. First, I must determine whether, under the circumstances involved in this case, the Tribe qualifies as a "citizen" or "person" entitled to bring an action under Section 1983. I conclude that it does. See Section D, infra. Second, I must determine whether the Tribe's present section 1983 action can be brought in federal court under the "Indian tribes" exception to the Tax Anti-Injunction Act, 28 U.S.C. Sec. 1341 (1982). I conclude that it can. See id
 
 
 [4]
 The majority asserts that although England creates an exception to traditional res judicata principles, it is essentially an all-or-nothing proposition: parties, like the Tribe, may not raise some, but not all, of their federal claims in state court while reserving their remaining federal claims. No such requirement has ever been imposed under the England doctrine. We stated in Tovar that "[a] free and unreserved submission of all federal claims ... is necessary to bar return to the federal court." 609 F.2d at 1294 (emphasis added). The word "all" would be superfluous if the majority's interpretation of England were correct
 The majority also criticizes the Tribe for maintaining that its failure to raise its fourteenth amendment claims before the Supreme Court was due to the limited nature of the Court's order granting certiorari in Bracker. Majority opinion at 1214. This issue is irrelevant to the disposition of the present case. The Tribe did not litigate its fourteenth amendment claims in the Arizona state courts, and therefore could not have raised them in the Bracker appeal. Yet, as noted above, based upon the decisions in England and Tovar, this tactical decision by the Tribe does not preclude it from relying on those claims as a basis for section 1988 attorney's fees in the present action.
 
 
 [5]
 The Court's conclusion in Mitchell that sections 406, 407, and 466 create a trust relationship between tribes and the federal government was foreshadowed in Bracker, where the Court not only suggested that such a trust relationship existed, but also concluded that Arizona's challenged taxes interfered with the Tribe's rights under that trust relationship:
 [T]he [challenged] taxes would threaten the overriding federal objective of guaranteeing Indians that they will "receive the ... benefit of whatever profit [the forest] is capable of yielding ..." 25 C.F.R. Sec. 141.3(a)(3) (1979). Underlying the federal regulatory program rests a policy of assuring that the profits derived from timber sales will inure to the benefit of the Tribe, subject only to administrative expenses incurred by the federal government. That objective is part of the general federal policy of encouraging Tribes "to revitalize their self-government" and to assume control over their "business and economic affairs." Mescalero Apache Tribe v. Jones, 411 U.S. at 151 [93 S.Ct. at 1272]. The imposition of the taxes at issue would undermine that policy in a context in which the federal government has expressed a firm desire that the Tribe should retain the benefits derived from the harvesting and sale of reservation timber.
 Bracker, 448 U.S. at 149, 100 S.Ct. at 2586.
 
 
 [6]
 The act at issue in Keaukaha-Panaewa, the Hawaiian Admission Act, Public Law No. 86-3, 73 Stat. 4 (1959), required that lands originally held by the United States in trust for native Hawaiians be maintained "as a public trust ... for the betterment of the conditions of native Hawaiians ... and their use for any other object shall constitute a breach of trust." Hawaiian Admission Act, Sec. 5(f); see Keaukaha-Panaewa, 739 F.2d at 1469. Thus, the general terms and purposes of the Hawaiian trust are fairly similar to the terms and purposes of the trust for Indian timberlands identified by the Supreme Court in Mitchell and Bracker. See Mitchell, 463 U.S. at 219-25, 103 S.Ct. at 2969-72; Bracker, 448 U.S. at 149, 100 S.Ct. at 2586 (federal management of tribal timberlands is designed to "encourag[e] tribes 'to revitalize their self-government' and to assume control over their 'business and economic affairs' ") (citation omitted)
 
 
 [7]
 Section 465 authorizes Indians or Indian tribes to convey their lands in trust to the Secretary of the Interior in order to avoid state and local property taxes. See 25 U.S.C. Sec. 465; Chase v. McMasters, 573 F.2d 1011, 1014-16 (8th Cir.), cert. denied, 439 U.S. 965, 99 S.Ct. 453, 58 L.Ed.2d 423 (1978)
 
 
 [8]
 The majority's conclusion that the "regulatory legislation involved in this case is analogous to that involved in Boatowners [and Tenants Association, Inc. v. Port of Seattle, 716 F.2d 669 (9th Cir.1983),] where [this court] also found no 'enforceable rights,' " majority opinion at 1213, is plainly unsupported by a comparison of Boatowners and Mitchell. In Boatowners, we found that the
 language and legislative history [of the statute at issue, the River and Harbor Improvements Act, 33 U.S.C. Secs. 540-633 (1982),] indicate an intent to improve navigation, enhance commerce, and reduce vehicle-vessel traffic problems, all to the benefit of the general public. There is no evidence whatsoever of an intent to provide economical moorage or to create any special benefit for the class of pleasure craft owners. BOATA thus has no enforceable rights under the Act.
 Boatowners, 716 F.2d at 673-74 (emphasis added). In contrast, the Supreme Court concluded in Mitchell that sections 406, 407, and 466 were designed specifically to benefit Indians and Indian tribes and created a trust relationship in which these groups were the beneficiaries. Mitchell, 463 U.S. at 222-25, 103 S.Ct. at 2970-72.
 
 
 [9]
 The majority states that the Tribe's allegations concerning its fourteenth amendment claims in its complaint are "far too meager" for this court to determine whether or not they satisfy the Hagans "substantiality" test and support the district court's award of attorney's fees. Majority opinion at 1213. I do not agree. While the Tribe's presentation of these claims in its complaint and subsequent pleadings has not been especially detailed, a reading of the Tribe's pleadings, along with the Supreme Court's opinions in Bracker and recent due process and equal protection cases, makes it clear that the Tribe's fourteenth amendment claims satisfy the Hagans test
 However, given that the majority believes that it has no meaningful basis for determining whether the Tribe's fourteenth amendment claims support a fee award under Sec. 1988, majority opinion at 1213, I find it inexplicable that the majority does not remand this case for further development on this issue. Instead, the majority has simply discarded a considered fee-award judgment by the district court and vacated a $206,000 award to the Tribe.
 The majority states that the district court awarded attorney's fees based exclusively on the Tribe's preemption claim and did not even mention the Tribe's constitutional claims in making its fee award, majority opinion at 1215, but this is simply not true. The district court's findings and conclusions on the Tribe's section 1988 request plainly state that the court awarded attorney's fees based on all the Tribe's section 1983 claims. The court did not single out any one claim for special mention. Even if the district court's award had been based on the Tribe's preemption claim, we are required to affirm the award as long as the Tribe's section 1983 claims based on the Indian timber laws are meritorious or its fourteenth amendment claims are not frivolous.
 
 
 [10]
 Although purporting to apply the Hagans test in evaluating the district court's fee award, the majority questions whether the Tribe's fourteenth amendment claims have "sufficient merit" to justify a section 1988 award. This suggests that the majority has applied too strict a standard in reviewing the Tribe's fourteenth amendment claims, and has not simply examined whether those claims are "inescapably ... frivolous," as Hagans requires. Hagans, 415 U.S. at 537-38, 94 S.Ct. at 1379
 
 
 [11]
 The majority contends that the statements in the Bracker dissent concerning possible due process and equal protection claims arising out of the challenged Arizona taxes do not support the Tribe's fourteenth amendment claims, because these statements refer to claims potentially available to "Pinetop as a private corporation rather than to claims potentially available to the Tribe." Majority opinion at 1215. The majority maintains that the Tribe's fourteenth amendment claims, in contrast to Pinetop's, arise out of the Tribe's "status as a sovereign" and are based on the assumption that the Tribe is entitled to receive "beneficial [or preferential] treatment" above and beyond that of other individuals and entities. Id
 However, the majority has misinterpreted the Tribe's due process and equal protection claims and has confused them with the preemption claim it advanced in Bracker. Although the underlying premise of the Tribe's preemption claim in Bracker was that the State must accord special treatment to the Tribe's timberlands and cannot regulate them to the same extent as it regulates other timberlands, see generally Bracker, 448 U.S. at 145-53, 100 S.Ct. at 2584-89, the Tribe's fourteenth amendment claims in this action are based on the allegation that Arizona has impermissibly discriminated against the Tribe and singled it out by taxing it differently from other landowners in the state without any apparent rational justification.
 The Tribe has raised its fourteenth amendment claims in its capacity as a corporation seeking to make commercial use of its reservation lands. See Section D, infra. Its due process and equal protection claims are identical to those that any corporate entity would raise if it were treated disparately under a state taxing scheme. These claims have nothing to do with the Tribe's status as a sovereign entity. They arise out of the Tribe's joint commercial venture with Pinetop, see id., and are therefore identical to any fourteenth amendment claims that Pinetop would be entitled to raise as a corporation. Therefore, any statements in the Bracker dissent relating to possible due process and equal protection claims available to Pinetop would be equally applicable to the Tribe.
 
 
 [12]
 See the discussion relating to the Tribe's corporate or propriety capacity in Section D, infra
 
 
 [13]
 The majority asserts that the challenged Arizona taxes are typically assessed "without apportionment" between mileage driven on state-maintained roads and non-state-maintained roads for entities or landowners based in Arizona. Majority opinion at 1215 n. 13. Thus, according to the majority, the Tribe is not entitled under Arizona law to have the taxes chargeable to its and Pinetop's timber operations apportioned, and its demand for tax apportionment in its complaint represents a request for preferential treatment, as opposed to equal protection. Id. The majority interprets the Tribe's equal protection claim as alleging that the Tribe and Pinetop are constitutionally entitled to be treated "in the same manner as interstate truckers" passing through Arizona, and that the "tribal roads [on its reservation] should be treated as though they [are] in a separate state." Id
 However, the majority has misinterpreted the challenged Arizona taxing scheme, and oversimplified the Tribe's equal protection claim. Contrary to the majority's assertion, Arizona's fuel taxes are assessed for in-state taxpayers based upon the types of roads on which they use their vehicles. Section 28-1552 provides that "an excise tax [shall be] imposed [at the rate of eight cents per gallon] on use fuel used in the propulsion of a motor vehicle on any highway within this state." Ariz.Rev.Stat.Ann. Sec. 28-1552 (1985) (emphasis added); see Bracker, 448 U.S. at 139-40, 100 S.Ct. at 2581. Thus, according to the plain terms of this and other provisions, Arizona's use fuel tax is imposed only for gasoline used by taxpayers to travel on state-maintained highways--it is not assessed based upon their total mileage during the year. See Ariz.Rev.Stat.Ann. Secs. 28-1551(4) (1985) (defining "highway" to mean only those roads "open to the use of the public "), Sec. 28-1578 (authorizing refund of use fuel tax to "[a]ny person who purchases tax paid use fuel and ... uses it in this state for purposes other than to propel a motor vehicle upon the highways of this state ") (emphasis added); see also Ariz.Stat.Ann. Secs. 28-1555(B)(1) (taxpayers can obtain written authorization not to pay use fuel tax to vendors and instead to self-assess tax if they "operate a motor vehicle [either] within and without this state or on and off the highways of this state "), Sec. 28-1556 (establishing rebuttable presumption that all fuel inserted into a vehicle's gas tank is "consumed in propelling the vehicle on the highways of this state ") (emphasis added).
 Moreover, Arizona's assistant attorney general made a series of statements and concessions during the Supreme Court argument in Bracker indicating that Arizona apportions mileage when assessing its challenged taxes. He stated initially that " 'so long as road[s] remain[ ] private thoroughfare[s, the] use of those road[s] would not be subject to the State tax.' " Bracker, 448 U.S. at 154 n. 3, 100 S.Ct. at 2589 n. 3 (Stevens, J., dissenting) (quoting Assistant Attorney General Macpherson). Yet, if the majority's interpretation of the Arizona tax statutes is correct, taxpayers would not be permitted to apportion their taxes based upon their relative use of state highways and other roads, and their use of "private thoroughfare[s]" would be taxed so long as they also used state highways at some point during the year. Furthermore, Arizona conceded during the Supreme Court argument that it did not intend to "tax use on ... tribal roads" regardless of the state courts' prior decisions on the matter, and the Tribe's attorney welcomed this concession. Id. at 154-56 & n. 4, 100 S.Ct. at 2589-90 & n. 4 (Stevens, J., dissenting) (quoting attorneys Macpherson and Wake); see id. at 148 n. 14, 100 S.Ct. at 2589-90 n. 14. This concession would have been meaningless if, as the majority contends, Arizona's taxes were determined without apportionment, because the Tribe admitted that it and Pinetop used state highways and B.I.A. roads in their operations. Id. at 154 n. 2, 100 S.Ct. at 2589 n. 2 (Stevens, J., dissenting). The three Justices dissenting in Bracker expressly noted that Arizona's concessions regarding tribal and private roads would reduce the taxes owed by Pinetop and the Tribe: thus, they expressly interpreted the Arizona statutes to authorize apportionment of mileage in determining the amount of taxes owed. See id. at 159 & n. 8, 100 S.Ct. at 2591 & n. 8 (Stevens, J., dissenting). For all these reasons, it seems clear that Arizona assesses at least some of its challenged taxes based upon the road-use of the individual taxpayer.
 The Tribe's equal protection claim in this action arises out of Arizona's refusal to apportion the Tribe's and Pinetop's mileage in assessing their fuel taxes, even though it apportions mileage for "other operations that occur in part over state roads and part over non-state roads." First Amended Complaint, p XXIII. Despite the majority's claims, these "other operations" include Arizona-based as well as non-Arizona-based individuals and entities. The subsequent reference in the Tribe's complaint to "carriers that operate [only] partly in the State of Arizona," upon which the majority relies, does not signify that the Tribe's equal protection claim is entirely premised upon the treatment received by "interstate truckers," as the majority contends--it merely states an alternative equal protection argument. See id.
 
 
 [14]
 The majority asserts that because the challenged Arizona use fuel tax "is expressly levied 'in lieu of' direct fuel taxes," it is therefore "analytically indistinguishable from a direct fuel tax." The majority contends as a result that the Tribe cannot challenge Arizona's unequal imposition of the use fuel tax, because it could "not seriously contend that Arizona should be forced to apportion direct fuel taxes collected at the pump." Majority opinion at 1216
 This argument is seriously flawed. The fact that a state can conceivably tax an individual or entity under one tax scheme does not automatically entitle it to impose taxes upon that individual or entity under a different tax scheme when other similarly situated individuals or entities are not being taxed under that scheme. Otherwise, there could never be due process or equal protection challenges to state taxing schemes, because it would always be possible to hypothesize situations in which the victims of alleged discriminatory treatment could be taxed.
 Arizona chose to adopt its use fuel tax. It is responsible for administering that tax in an evenhanded, non-discriminatory fashion that will withstand due process and equal protection scrutiny. If Arizona chooses to change to a direct fuel tax so that it can tax the Tribe and other private landowners for fuel used on non-state-maintained roads and private property, it certainly would be entitled to do so. However, the fact that Arizona could conceivably change its tax system does not affect the resolution of this case.
 
 
 [15]
 The Tax Anti-Injunction Act provides that:
 [Federal] district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.
 28 U.S.C. Sec. 1341. Courts have recognized a limited exception to this provision for "Indian Tribes." See Moe v. Confederated Salish and Kootenai Tribes, 425 U.S. 463, 472-75, 96 S.Ct. 1634, 1640-42, 48 L.Ed.2d 96 (1976); see also Section D, infra. Since the Anti-Injunction Act applies only to actions brought in federal court, had the Tribe chosen to raise its section 1983 claims in its parallel state-court action, section 1341 would not have served as a bar to its section 1983 claims.
 
 
 [16]
 A tribe's ability to bring an action in federal court challenging the imposition of state taxes depends on the capacity in which the tribe initiates the litigation and the basis of the tribe's standing to bring such a challenge. The Supreme Court indicated in Moe v. Confederated Salish and Kootenai Tribes, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976), that in actions involving challenges to the imposition of state taxes, the source of parties' standing to bring the actions must coincide with the basis on which subject-matter jurisdiction is asserted. See id. at 468 n. 7, 96 S.Ct. at 1639 n. 7
 In the present action, the Tribe's standing is based upon its proprietary, corporate activities; as a result, in order to maintain its action, the Tribe must be entitled to bring a section 1983 action and must qualify for the "Indian tribes" exception to section 1341 while acting in its corporate capacity. The Tribe could also have challenged Arizona's taxes in its sovereign, governmental capacity, if the imposition of those taxes adversely affected its exercise of its powers of self-government, or if the taxes were imposed on the Tribe's governmental operations. See id.; see also Assiniboine & Sioux Tribes v. Montana, 568 F.Supp. 269, 276 (D.Mont.1983) (tribal vehicles had to be taxed for Tribe to have standing to seek refund under Moe ). Such an action would clearly not be barred by section 1341. See, e.g., Moe, 425 U.S. at 474-75, 96 S.Ct. at 1641-42. However, it is doubtful whether the Tribe qua sovereign would qualify as a "citizen of the United States or other person" eligible to bring an action under section 1983 for deprivation of its rights, privileges, or immunities. See City of Safety Harbor v. Birchfield, 529 F.2d 1251, 1253-55 (5th Cir.1976) (municipality is not a "person" entitled to bring section 1983 action); Buda v. Saxbe, 406 F.Supp. 399, 403 (E.D.Tenn.1974) (a "state is not a '... citizen of the United States or other person within the jurisdiction thereof ...' within the contemplation of 42 U.S.C. Sec. 1983."); Spence v. Boston Edison Co., 390 Mass. 604, 459 N.E.2d 80, 83-84 (1983) (city housing authority cannot bring section 1983 action to enforce due process or equal protection rights); see also City of South Lake Tahoe v. California Tahoe Regional Planning Agency, 625 F.2d 231, 233 (9th Cir.) (" '[p]olitical subdivisions of a state may not challenge the validity of a state statute under the Fourteenth Amendment."), cert. denied, 449 U.S. 1039, 101 S.Ct. 619, 66 L.Ed.2d 502 (1980).
 Similarly, the Tribe could have brought an action challenging Arizona's vehicle taxes as a representative of or as parens patriae for its individual members, in order to vindicate their individual rights. See, e.g., Assiniboine & Sioux Tribes, 568 F.Supp. at 277; see also Little Earth of United Tribes, Inc. v. United States Department of Housing and Urban Development, 584 F.Supp. 1292, 1295-97 (D.Minn.1983). When acting solely in a representative capacity, a tribe's standing is based exclusively upon the standing of its individual members: the tribe simply raises claims that its members could raise individually, and essentially stands in the same position as they would, had they brought the action collectively. See International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America v. Brock, --- U.S. ----, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986); Hunt v. Washington Apple Advertising Commission, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); United States v. Students Challenging Regulatory Agency Procedures (S.C.R.A.P.), 412 U.S. 669, 683-90, 93 S.Ct. 2405, 2413-17, 37 L.Ed.2d 254 (1973); Sierra Club v. Morton, 405 U.S. 727, 735-39, 92 S.Ct. 1361, 1366-68, 31 L.Ed.2d 636 (1972); see also Assiniboine & Sioux Tribes, 568 F.Supp. at 277. Thus, the Tribe would clearly be entitled to bring a section 1983 action based upon alleged violations of its members' due process and equal protection rights, or their rights under the Indian reservation timber laws. See, e.g., Thompson v. New York, 487 F.Supp. 212, 216 (N.D.N.Y.1979) (individual Indians can maintain section 1983 actions based on alleged violations of their equal protection rights).
 However, it would appear inconsistent with our prior decisions to allow tribes suing merely as representatives of their individual members to avoid the bar of section 1341. We have held that the "Indian tribes" exception to section 1341 does not apply to suits brought by individual Indians, see Comenout v. Washington, 722 F.2d 574, 577 (9th Cir.1983); Dillon v. Montana, 634 F.2d 463, 469 (9th Cir.1980), or by Indian entities that are less than full-scale "Indian tribe[s] or band[s]," as that phrase is used in 28 U.S.C. Sec. 1362 (1982). See Navajo Tribal Utility Authority v. Arizona Department of Revenue, 608 F.2d 1228, 1231 (9th Cir.1979). In light of these decisions, authorizing Indian tribes to bring representative actions in federal court challenging the collection of state taxes on behalf of their members would undermine and perhaps trivialize section 1341 by enabling individual Indians to avoid section 1341's bar simply by having their tribe bring a "representative" action on their behalf. See Assiniboine & Sioux Tribes, 568 F.Supp. at 277. Moreover, the Supreme Court noted in Moe that if standing to bring an action challenging the imposition of state taxes is based exclusively upon the rights of individual tribal members, those tribal members must be authorized to invoke the jurisdiction of the federal courts in their own right. See Moe, 425 U.S. at 468 n. 7, 96 S.Ct. at 1639 n. 7 (citing Zahn v. International Paper Co., 414 U.S. 291, 294, 94 S.Ct. 505, 508, 38 L.Ed.2d 511 (1973)).
 
 
 [17]
 Section 17 of the IRA authorizes Indians to request the Secretary of the Interior to issue charters of incorporation to their tribes once the tribes have adopted constitutions and bylaws and organized tribal governments under section 16 of the IRA, 25 U.S.C. Sec. 476 (1982). Congress enacted section 17 specifically "to rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of oppression and paternalism." Mescalero Apache Tribe v. Jones, 411 U.S. 145, 152, 93 S.Ct. 1267, 1272, 36 L.Ed.2d 114 (1973) (quoting H.R.Rep. No. 1804, 73rd Cong., 2d Sess. 1 (1934)). It sought to promote the organization of tribal business enterprises and to enable those enterprises "to enter the white world on a footing of equal competition." 78 Cong.Rec. 11732 (1934); accord Mescalero Apache Tribe, 411 U.S. at 157, 93 S.Ct. at 1275 (quoting above passage from Congressional Record)
 The Supreme Court and other courts have recognized a distinction between tribes acting as business entities pursuant to IRA section 17 and as sovereign, governmental entities pursuant to section 16, and have consistently indicated that the capacity in which a tribe is acting helps to determine its legal rights, privileges, and immunities. See Kerr-McGee Corp. v. Navajo Tribe of Indians, 471 U.S. 195, 105 S.Ct. 1900, 1903, 85 L.Ed.2d 200 (1985) (distinguishing between tribe's "role as commercial partner" and its "role as sovereign"); Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 145-47, 102 S.Ct. 894, 905-06, 71 L.Ed.2d 21 (1982) (noting same distinction in determining that tribe was entitled to impose taxes in its sovereign capacity upon parties with whom it had lease agreements); Ramey Construction Co. v. Apache Tribe, 673 F.2d 315, 320 (10th Cir.1982) (tribe's "constitutional and corporate entities [are] separate and distinct" and may differ in the extent to which they possess tribal sovereign immunity); Parker Drilling Co. v. Metlakatla Indian Community, 451 F.Supp. 1127, 1131-35 (D.Alaska 1978); Atkinson v. Haldane, 569 P.2d 151, 174-75 (Alaska 1977); Request for Interpretative Opinion on the Separability of Tribal Organizations Organized Under Section 16 and 17 of the Indian Reorganization Act, 65 I.D. 483, 484 (1958) (Solicitor's report analyzing IRA's legislative history and concluding that "the powers, privileges and responsibilities of [section 16 and 17] tribal organizations materially differ"). In analyzing the IRA's legislative history and the differences between tribes acting in their section 16 and section 17 capacities, the Solicitor concluded that:
 The purpose of Congress in enacting section 16 of the Indian Reorganization Act was to facilitate and to stabilize the tribal organization of Indians residing on the same reservation, for their common welfare. It provided their political organization. The purpose of Congress in enacting section 17 of the Indian Reorganization Act was to empower the Secretary to issue a charter of business incorporation to such tribes to enable them to conduct business through this modern device, which charter cannot be revoked or surrendered except by act of Congress. This corporation, although composed of the same members as the political body, is to be a separate entity, and thus more capable of obtaining credit and otherwise expediting the business of the tribe, while removing the possibility of federal liability for activities of that nature. As a result, the powers, privileges and responsibilities of these tribal organizations materially differ.
 
 
 [65]
 I.D. at 484 (emphasis added)
 
 
 [18]
 The Supreme Court has suggested that to determine whether a tribe has acted in its business or its sovereign capacity, courts must look beyond the formalities of whether the tribe has actually incorporated itself under section 17, and must look instead to the substance of the conduct in question and the powers actually granted to the tribe in its constitution and bylaws. See Mescalero Apache Tribe, 411 U.S. at 157-58 & n. 13, 93 S.Ct. at 1275 & n. 13; see also Atkinson, 569 P.2d at 171. But cf. S. Unique, Ltd. v. Gila River Pima-Maricopa Indian Community, 138 Ariz. 378, 674 P.2d 1376, 1382 (Ariz.Ct.App.1983) (citing 1958 Department of Interior opinion and focussing on formalities of whether tribal corporation had separate officers and directors, bank accounts, assets, and property holdings from the tribe's section 16 governmental entity)
 
 
 [19]
 For example, Congress intended that tribal business corporations would be able to enter into contracts waiving any possible sovereign immunity from unconsented suits. Parker Drilling, 451 F.Supp. at 1131; Atkinson, 569 P.2d at 174-75. If tribal corporations did not have such a capacity, they would be at a distinct disadvantage vis-a-vis other corporations, because private parties would be discouraged from entering into contractual agreements with them
 
 
 [20]
 The reference to a "duly recognized" governing body in section 1362 merely indicates that the Tribe must have an IRA government organized under IRA section 16. Since tribes can become incorporated under IRA section 17 only if they already have a section 16 government, this reference to section 16 does not mean that Congress intended section 1362 to apply only to tribes acting in a sovereign or governmental capacity
 
 
 [21]
 Navajo Tribal Utility contains dictum stating that "[s]uits brought by tribal corporations have also been found to fall outside the scope of section 1362." 608 F.2d at 1231. The court cites Cape Fox Corp. v. United States, 456 F.Supp. 784, 798 (D.Alaska 1978), rev'd on other grounds, 646 F.2d 399 (9th Cir.1981), and two other cases for that proposition. However, Cape Fox is inapposite. It involved "a Native corporation organized under the Alaska Native Claims Settlement Act," id. at 797, and thus did not even involve a tribe or band eligible to bring an action under section 1362. See id. at 797-98. The other cases are conclusory in their analysis, and do not provide any basis for deciding that the Tribe was not eligible to bring a section 1362 action in this case. See United States v. State Tax Commission, 505 F.2d 633, 638 (5th Cir.1974); Dodge v. First Wisconsin Trust Co., 394 F.Supp. 1124, 1127 (E.D.Wis.1975)